Filed 4/23/20

**CERTIFIED FOR PUBLICATION**


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| LAUREN PINTER-BROWN, Plaintiff and Respondent, v. THE REGENTS OF THE UNIVERSITY OF CALIFORNIA, Defendant and Appellant. | B290086 (Los Angeles County Super. Ct. No. BC624838) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Michael Linfield, Judge. Reversed.

Morgan, Lewis & Bockius, Barbara A. Fitzgerald, Kathryn T. McGuigan, Jason S. Mills; Orrick, Herrington & Sutcliffe and Eric A. Shumsky, Jeremy Peterman, Jessica Perry, Elizabeth Moulton and Evan Rose for Defendant and Appellant.

Shegerian & Associates, Carney R. Shegerian and Jill P. McDonell for Plaintiff and Respondent.

_____

**INTRODUCTION**

Dr. Lauren Pinter-Brown sued The Regents of the

University of California for gender discrimination based on a series of events that took place while she was a Professor of Medicine at the University of California at Los Angeles (UCLA). The jury found in favor of Dr. Pinter-Brown and awarded her upward of $13 million in economic and noneconomic damages.

Unfortunately, the trial court committed a series of grave errors that significantly prejudiced The Regents' right to a fair trial by an impartial judge.

First, the court delivered a presentation to the jury highlighting major figures in the civil rights movement, and told the jury their duty was to stand in the shoes of Dr. Martin Luther King and bend the arc of the moral universe toward justice. Second, the court allowed the jury to hear about and view a long list of discrimination complaints from across the entire University of California system that were not properly connected to Dr. Pinter-Brown's circumstances or her theory of the case. Third, the court allowed the jury to learn of the contents and conclusions of the Moreno Report, which documented racial discrimination occurring throughout the entire UCLA campus. Finally, the court allowed Dr. Pinter-Brown to resurrect a retaliation claim after the close of evidence despite having summarily adjudicated that very claim prior to trial.

These errors were cumulative and highly prejudicial. They evidence the trial court's inability to remain impartial and created the impression that the court was partial to Dr. Pinter-Brown's claims.

We must reverse.

## FACTUAL AND PROCEDURAL BACKGROUND

**I.    The Complaint, Summary Adjudication, Motion in Limine, and Dr. Pinter-Brown's Theories of Liability**

On June 22, 2016, Dr. Pinter-Brown filed a complaint against UCLA, The Regents of the University of California, Dr. Sven de Vos, and Does 1 to 100 alleging:  (1) discrimination on the basis of gender in violation of the Fair Employment and Housing Act (FEHA); (2) harassment on the basis of gender in violation of FEHA; (3) retaliation for complaints of discrimination and/or harassment on the basis of gender in violation of FEHA; (4) discrimination on the basis of age in violation of FEHA; (5) harassment on the basis of age in violation of FEHA; (6) violation of Labor Code section 1102.5; (7) violation of the Equal Pay Act; (8) intentional infliction of emotional distress; and (9) defamation.

On September 21, 2016, Dr. Pinter-Brown dismissed the eighth cause of action for intentional infliction of emotional distress.  On June 12, 2017, the parties stipulated to dismissal of the seventh cause of action for violation of the Equal Pay Act.  On August 7, 2017, Dr. Pinter-Brown dismissed Dr. de Vos from the action without prejudice.

On August 17, 2017, the trial court granted UCLA's[1] motion for summary adjudication of the second, third, sixth, and ninth causes of action (harassment on the basis of gender;

---

[1]    The record and appellate briefing refer to defendants and appellant as UCLA and The Regents.  We refer to them as UCLA throughout this opinion, as Dr. Pinter-Brown was employed by UCLA and the acts of discrimination she alleged all occurred at UCLA.

retaliation for complaints of discrimination; violation of Labor Code section 1102.5; and defamation). Jury trial therefore proceeded on the remaining three causes of action for discrimination on the basis of gender, discrimination on the basis of age, and harassment on the basis of age. The jury found in favor of UCLA on the age discrimination claims and Dr. Pinter-Brown does not appeal these verdicts. Accordingly, we omit discussion of the facts underlying these claims and the theories upon which both parties argued them.

Dr. Pinter-Brown proceeded on two theories with respect to her gender discrimination claim. She argued she was subjected to an adverse employment action and/or constructively discharged. Under both theories, she was required to prove she was employed by UCLA; her gender was a substantial motivating reason for the constructive discharge and/or the adverse employment action; she was harmed; and UCLA's conduct was a substantial factor in causing her harm. To prove she was subjected to an adverse employment action, Dr. Pinter-Brown had to prove UCLA took an action or engaged in a course or pattern of conduct that, taken as a whole, materially and adversely affected the terms, conditions, or privileges of her employment. To prove constructive discharge, Dr. Pinter-Brown had to prove UCLA, through its officers, directors, managing agents or supervisory employees, intentionally created or knowingly permitted working conditions so intolerable a reasonable person in her position would have no reasonable alternative except to resign.

On December 19, 2017, UCLA filed a motion in limine seeking to exclude "me too" evidence, that is, evidence, testimony, or reference to alleged mistreatment of employees other than Dr.

4

Pinter-Brown by UCLA, "including evidence and testimony referencing other claims, lawsuits, investigations, complaints, or grievances" involving UCLA or its employees. The court denied the motion on January 16, 2018.

## II.  The Court's Remarks to the Prospective Jurors

Jury trial commenced on January 29, 2018. As the prospective jurors sat in the courtroom, the trial court stated: "The arc of the moral universe is long. Dr. Martin Luther King said these words in 1965. The arc of the moral universe is long, but it bends toward justice." The court welcomed the jurors, saying, "[i]f you are selected as a juror in this case, your job will be to help bend that arc toward justice." He then told the jurors Martin Luther King stood on the steps of the Lincoln Memorial in 1963 and gave his famous "I Have a Dream" speech. "In there," the court continued, "he spoke of his dream that someday we would live in a society where people were judged by the content of their character and not by the color of their skins." The court then proceeded to play a video (not part of the record on appeal) and continued to give the prospective jurors a presentation about various noted civil rights leaders standing up for justice throughout history. A verbatim transcript of the court's remarks is attached to this opinion as Appendix A, starting on page 70. What follows here is a summary of the court's remarks.

The court discussed segregation, people being denied the right to vote, and the tens of thousands of people who demonstrated for equal rights for African-Americans in the march from Selma to Montgomery, Alabama during the civil rights movement. The court discussed Rosa Parks and her arrest and conviction for sitting in the front of a bus, which led to a widespread community response in protest. The court told the

5

jury that Parks's attorneys filed a lawsuit that went up to the United States Supreme Court, which held segregation on buses illegal.

The court talked about Elizabeth Jennings, who refused to disembark a trolley in New York City in 1854 after the driver told her to wait for a car for non-white people. The court told the jurors that her attorney took her case to an all-white jury, which found the trolley car company had mistreated Jennings and awarded her one year's salary. The court then informed the jury that the young attorney who represented Jennings went on to become the President of the United States 27 years later.

The court told the jury how Susan B. Anthony voted in a national election before women won suffrage, was arrested, and then acquitted and ordered to pay a $100 fine. "So she stood up in court and said she would never pay a penny of that unjust fine, and she died 25 years later. She still hadn't paid the fine, but women still didn't have the right to vote." The court then mentioned the first woman elected to Congress, Jeannette Rankin, and the first demonstration in front of the White House for women's suffrage. "[F]inally, 1920, the next year," the court continued, "Congress passed the 19th Amendment. It was ratified by the States and women gained the right to vote. That arc is long, it does bend toward justice."

The court then told the jury about Japanese internment camps during World War II and Fred Korematsu, convicted for resisting internment. The court discussed the Supreme Court's initial affirmance of his conviction, the eventual reversal of that conviction, Congress's decision to award reparations to interned Japanese-Americans, and Ronald Reagan's proclamation

6

apologizing for the internment. Again, the court stated, "[t]hat arc is long, it does bend toward justice."

The court told the jury about Dolores Huerta and Cesar Chavez who, the court stated, "appeared . . . directly in this court many times" and brought attention to "the plight of the poorest of the poor here in California, the Mexican-American and Filipino-American farm workers who were being denied their basic rights under the law." The court told the jury that Huerta and Chavez sometimes appeared as plaintiffs and sometimes as defendants, "each time seeking justice for people just like you sitting here on a jury."

The court told the jury about Harvey Milk, the first openly gay public official in the United States, and his assassination by a member of the San Francisco Board of Supervisors. "He didn't get to see that just . . . two and a half years ago, our Supreme Court ruled that discrimination against gays and lesbians was unconstitutional, that gays and lesbians, like everyone else, had the right to marry and raise a family."

The judge told the jury he was honored to sit before "the people who are going to be bending that arc." The court then clarified: "Now, why do I talk to you about Dr. King and bending the arc? Is the plaintiff in this case a Dr. King or a Rosa Parks or Elizabeth Jennings? No. Is the defendant in this case a Dr. King or Susan B. Anthony or Cesar Chavez? No. But you as jurors in this case are going to become Dr. King. It's going to be your job to help bend that arc toward justice by rendering a verdict based on the law and the evidence that you are going to be hearing in this case."

The court then concluded its presentation by reciting a passage from Harper Lee's *To Kill a Mockingbird* in which attorney Atticus Finch tells the jury, "a court is only as sound as its jury, and a jury is only as sound as the men and women who make it up." The court then swore in the members of the jury panel. Attorneys for each party then briefly introduced themselves to the panel and jury selection began.

After a break, UCLA requested a mistrial, noting the court's presentation "lauded this country's struggle with discrimination on the basis of a number of protected bases, including gender, through the highlight of individuals who stood up for themselves against others including governments and institutions." UCLA expressed its concern that the presentation created a "great risk" that the prospective jurors were "preconditioned" to a determination of the facts. "I think the suggestion of an arc of justice," UCLA argued, "in this particular case, [is] not appropriate for [an] individual who's going to argue that she stood up against an institution and a bunch of men and somehow she was harmed and wronged and this is her day on the bus or in the suffragette movement, what have you." UCLA stated it did not believe any admonition could cure the problem, and asked the court to pull another jury panel.

The court denied the motion. The judge stated he gives the presentation before all the trials in his courtroom, and that "sometimes justice is done by the jurors ruling on behalf of the plaintiffs," and "sometimes justice is done by the jurors ruling on behalf of the defendants." The judge said his presentation was a correct statement of the law and that he did not believe the presentation prejudiced the jury.

## III. The Trial

Dr. Pinter-Brown argued UCLA discriminated against her based on her gender from 2008 to 2015. During those years, she argued, one of her colleagues continually harassed, disrespected, and intimidated her, obstructed her ability to do clinical research, and physically intimidated her. She argued the people to whom she went for help behaved as sexists, refused to investigate her complaints, and denied any of her problems were due to her gender. Instead, she alleged, these powerful doctors framed the issue as an interpersonal conflict between two colleagues. Dr. Pinter-Brown argued that after she complained about the discrimination, her superiors began to nitpick and insult her before they ultimately suspended her research privileges, obstructed her research trials, blamed her for mistakes that were not her fault, removed her as Director of UCLA's Lymphoma Program, and then gave that title to the very man who had harassed and intimidated her for years.

We provide an overview of the testimony and evidence provided by both parties at trial.

### A. Dr. Pinter-Brown Encounters Problems with Dr. de Vos and Her Supervisors Do Not Help.

In June 2005, Dr. Pinter-Brown was hired by the UCLA School of Medicine as Clinical Professor of Medicine and Director of the Lymphoma Program in the Division of Hematology-Oncology. At the time of her appointment to UCLA, Dr. Pinter-Brown had built an international reputation as an expert in T-cell lymphoma. There were two other doctors in the Lymphoma Program: Dr. Sven de Vos and Dr. John Timmerman. Dr. Herbert Eradat joined the Program one year later.

9

### 1. Dr. Pinter-Brown's Testimony

According to Dr. Pinter-Brown, Dr. de Vos frequently called her and came to her clinic during her first three months directing the Lymphoma Program. Eventually, she had to tell Dr. de Vos she was busy and did not "have time for that." Dr. Pinter-Brown's relationship with Dr. de Vos then became "acrimonious." Dr. de Vos became "oppositional," "disrespectful," and disruptive at meetings, even screaming at her a few times. Dr. de Vos would refuse to make eye contact with Dr. Pinter-Brown, talk over her, and interrupt her to the point where she could not finish a sentence. At some meetings, Dr. de Vos would tap his foot rapidly, keep looking at the clock, and stare at his phone "like [Dr. Pinter-Brown] was wasting his time." At one meeting, Dr. de Vos turned his chair around so that Dr. Pinter-Brown faced his back across the table.

Dr. de Vos would not follow the instructions Dr. Pinter-Brown gave to the Lymphoma Program doctors to prepare for meetings. And, although all the doctors were supposed to vote on which clinical trials to undertake, Dr. de Vos would commit to doing trials without clearing it with the other doctors.

Dr. de Vos started trying to humiliate Dr. Pinter-Brown at monthly meetings that he ran for approximately 50 to 60 doctors. Because she had so many patients, Dr. Pinter-Brown testified, she always arrived late and would come into the meeting with her food. As she would ascend the stairs to find a seat, Dr. de Vos would ask, "Lauren, what do you think about this case," even though she had been absent during the presentation of the case. "I'm trying to sit in a seat," Dr. Pinter-Brown testified, "and everybody would turn around, and it got to be kind of a running joke. They would titter and giggle and it was humiliating. I was

10

trying to establish myself in this institution as somebody that should be respected because I know about lymphomas, and I'm trying to create a program with my colleagues.  It was like I was the butt of a joke."

Dr. de Vos called her by her first name at large conferences with doctors, but referred to male doctors by their doctor title and last name.  Dr. de Vos did not behave with male doctors the way he behaved with her.  Instead, he was "totally engaged" with the other doctors in the Lymphoma Program, and would look them in the eye when he spoke with them.  Dr. de Vos was "deferential" and "ingratiating" with Dr. Dennis Slamon, and Dr. John Glaspy, the Chief and Assistant Chief, respectively, of the Division of Hematology and Oncology.

Approximately 18 months into her directorship, Dr. Pinter-Brown complained to Drs. Slamon and Glaspy about Dr. de Vos.  She told them he was harassing her, repeatedly challenging her authority, and interfering with her ability to lead the Lymphoma Program.  In a meeting with Dr. Glaspy, she offered to resign from the directorship or to break off from the group and work on T-cell lymphoma on her own, but he dissuaded her.  He also told her it was not her job to "boss the guys around."  Both Dr. Glaspy and Dr. Slamon told her if she were a better leader, Dr. de Vos would not act the way he did.

In early 2011, six years into her directorship, Dr. Pinter-Brown came into the lymphoma clinic and proceeded to sit at an open desk to work on some charts.  Dr. de Vos, who was sitting nearby, turned to her and said, "You can't sit there.  I want the fellow to sit there."  This alarmed Dr. Pinter-Brown because she was the Director of the Lymphoma Program.  This behavior was "very unusual" because academic medicine is "a little, tiny bit

like the military," in where members are expected to act according to rank.  She could not imagine herself, she testified, asking an attending physician or faculty member to get up for a fellow to sit down.

In March 2011, Dr. Pinter-Brown noticed that somebody was putting her stacks of patient charts, which she placed on a desk in a small office of the clinic, on the floor in a different order.  Because Dr. Pinter-Brown had back problems, she would have to ask for help picking up the charts from the floor.  After asking the other doctors whether they moved her charts, Dr. Pinter-Brown deduced Dr. de Vos had been moving her charts to the floor.  Dr. Pinter-Brown approached Dr. de Vos one day in the small clinic office and asked why he was moving her charts.  He replied he needed to use the desk where she placed the charts to set up a printer.  Then, Dr. de Vos suddenly whipped around in his chair, pointed his finger in her face, and aggressively questioned her about whether she completed a physical exam on a trial patient.  After Dr. de Vos turned his back to her, Dr. Pinter-Brown decided she wanted to leave the room.  She picked up her purse and tapped Dr. de Vos's shoulder to let him know she was leaving.  Dr. de Vos then stood up with his mouth and fists clenched in a "menacing position" and said, "don't touch me like that."  Dr. Pinter-Brown then said, "this is the last time you are going to harass me," and ran out of the office.

Dr. Pinter-Brown then called Ms. Sherri Simpson, a senior administrative analyst at the Department of Medicine and asked for advice on how to handle a situation she found "increasingly hostile."  Ms. Simpson suggested Dr. Pinter-Brown contact Dr. Slamon or Dr. Glaspy.  Dr. Pinter-Brown spoke with Dr. Glaspy, who asked her if she wanted to break off from the group and

12

work on T- and B-cell lymphoma on her own.  She explained that option was no longer viable because she had become nationally known in her field and did not feel she should have to take on a lesser job because of the situation.  Dr. Glaspy referred Dr. Pinter-Brown to Dr. Jan Tillisch, whom Dr. Glaspy identified as a Title IX officer.  Dr. Tillisch told Dr. Pinter-Brown to stay away from Dr. de Vos, and he set up a meeting with her for five to six days later.

In the meantime, Dr. Pinter-Brown wrote a statement detailing her history with Dr. de Vos and emailed it to Dr. Tillisch.  Dr. Pinter-Brown laid out the above-described complaints, admitted that sometimes their discussions at program meetings were "quite heated," and stated she abruptly discontinued meetings several times when she thought the discussion was out of control.  Dr. Pinter-Brown concluded the statement by saying she felt her situation was "pervasive, . . . chronic, recurring and cumulative, culminating in an episode that made me feel that I was in an increasingly hostile work environment and in a situation where I felt fearful and unsafe."  Dr. Pinter-Brown stated she had to work for six years with a colleague from whom she perceived "a pattern of intimidation [and] opposition," in which she was "demeaned and not treated in a collegial manner."

When she arrived at the meeting with Dr. Tillisch, he told her she had a reputation as an "angry woman."  Dr. Tillisch related to Dr. Pinter-Brown an incident where they had a patient in common and Dr. Tillisch had not liked "what [she was] doing" with the patient.  Dr. Tillisch told Dr. Pinter-Brown she did not acknowledge him, appeared to not know who he was, and treated him "like a medical student."  Dr. Pinter-Brown clarified that she

13

did know who he was because she lived across the street from him at some point in the past.  She offered some details about their families, indicating she knew who he was.  Dr. Tillisch then "chang[ed] his tune," and stated, "[w]ell, you're right.  If you were a man, we would just say your behavior is assertive."  Dr. Tillisch then told her his daughter was a physician at UCLA and faced discrimination there.  "He understood that it's hard to be a woman."  Dr. Pinter-Brown further testified Dr. Tillisch told her male doctors referred to his daughter by her first name, but referred to male physicians by their doctor title.

Dr. Pinter-Brown then asked Dr. Tillisch to put her in touch with two female physicians if he felt she did not know how to handle herself, in the hope they could show her how to do "a better job."  At the end of the meeting, Dr. Tillisch again told Dr. Pinter-Brown to stay away from Dr. de Vos.  When Dr. Pinter-Brown stated that was not a good idea since they worked together, Dr. Tillisch told her he would speak more with Dr. Glaspy and Dr. Slamon and try to develop a better solution.  At some point during the meeting, Dr. Tillisch took Dr. Pinter-Brown's written statement, dropped it into the bottom drawer of his desk, said "no one needs to know about this," and closed the drawer.

After 10 days had passed without hearing from Dr. Tillisch, Dr. Pinter-Brown called him.  He did not return her call.  She eventually had two more brief meetings with Dr. Tillisch.  He ultimately told her there was no solution to the situation, and she should keep avoiding Dr. de Vos.  At some point during her communications with him, Dr. Tillisch told Dr. Pinter-Brown, "Just because you're a diva doesn't mean you can act like one."  Dr. Pinter-Brown attempted to avoid Dr. de Vos as much as

possible from that point on, but he continued to "give [her] attitude" and "rage" on occasions when they did interact. Dr. Pinter-Brown stated Dr. de Vos would "parade past [her] area" in the clinic even though there was a shorter way to get where he was going and ask her questions while she was in the middle of seeing patients.

Dr. Tillisch did not do anything to help resolve her problems with Dr. de Vos. Dr. Pinter-Brown complained again to Dr. Glaspy and Dr. Slamon, but they "shut [her] down." At a salary negotiation meeting, for example, Dr. Pinter-Brown told Dr. Slamon: "I don't think you understand. I've worked for the County of Los Angeles for 25 years. I saw murderers in the jail ward. I know what people look like when they are out of control. And I am very hard to intimidate. When I tell you that I was frightened, I really mean it." Presumably, Dr. Pinter-Brown was referring to the March 2011 incident in the small office with Dr. de Vos. Dr. Pinter-Brown tried multiple times to get Dr. Slamon to take her seriously. During one conversation, Dr. Slamon told Dr. Pinter-Brown, "I don't need to hear this story from you. I already heard it from de Vos. Sometimes I am in meetings where people don't like me and I don't like them and you just have to suck it up."

Dr. Pinter-Brown testified that in at least half of her annual salary negotiation meetings, and in additional individual meetings, she told both Dr. Glaspy and Dr. Slamon that she felt harassed by Dr. de Vos. At one of the meetings, Dr. Glaspy told Dr. Pinter-Brown, "Everyone hates you." Dr. Slamon told Dr. Pinter-Brown she was not a team player and, without investigating the issue first, accused her of not putting patients on other people's protocols. When Dr. Pinter-Brown asked Dr.

15

Slamon whether he could substantiate the claim she was not putting patients on other physicians' protocols, Dr. Slamon replied, "No, but we are going to, and if I find out that you are not putting people in other people's protocols, I will isolate you." Dr. Slamon also criticized Dr. Pinter-Brown's leadership skills and told her that if she were a better leader, "Dr. de Vos wouldn't act up that way."[2]

Having no success with Dr. Slamon or Dr. Glaspy, Chief and Assistant Chief of her division, Dr. Pinter-Brown approached Dr. Jonathan Hiatt, Dean of Faculty. The problems were still occurring with Dr. de Vos and staying away from him was not tenable for her. When she and Dr. Hiatt met in March 2012, Dr. Hiatt told her she came to the right person and he would do everything he could to help her. Dr. Pinter-Brown told Dr. Hiatt it was ironic Dr. Tillisch, a Title IX investigator, made sexist comments calling her an angry woman and a diva, and telling her she would be treated differently if she were a man. Dr. Hiatt stated the first step was for him to call Dr. Fogelman, Chief of Medicine. At some point thereafter, Dr. Hiatt told Dr. Pinter-Brown he had spoken to Dr. Fogelman, who stated he would start an investigation.

In June 2012, Dr. Tillisch notified Dr. Pinter-Brown he had scheduled a meeting for her with two female faculty: Dr. Currier and Dr. Pregler. Dr. Pinter-Brown again sent Dr. Tillisch the

---

[2]    Dr. Pinter-Brown provided conflicting testimony about the date of this interaction with Dr. Slamon. Early in trial, she testified this interaction took place in the last 18 months before she left UCLA in December 2015. Toward the end of trial, however, she testified this occurred during a 2011 salary negotiation meeting.

statement she prepared for her first meeting with him, along with a follow-up about what had occurred in the meantime, and asked Dr. Tillisch to pass the statements along to those who would be at the meeting so they would understand her concerns. When Dr. Pinter-Brown arrived at the meeting, Dr. Currier and Dr. Pregler said they had received no statements. Dr. Pregler suggested Dr. Pinter-Brown contact the ombudsman about her concerns with Dr. de Vos in part to determine whether the ombudsman had received similar complaints from others about Dr. de Vos. Dr. Pinter-Brown replied she would be surprised if anybody else at UCLA would go through the process of trying to get help because it was so "demeaning and hurtful." Dr. Tillisch told everyone at the meeting not to call the ombudsman. He asked Dr. Pinter-Brown to leave while he and the other two doctors discussed the issue. Dr. Pinter-Brown followed up twice in the coming weeks to inquire about the investigation. Dr. Tillisch told her if she "really wanted to know, the bottom line" was Dr. Slamon should have told Dr. Pinter-Brown what her duties were as the director.

### 2. Ms. Sherri Simpson's Testimony

Sherri Simpson worked at the UCLA Medical School for approximately 40 years and retired in 2013. Ms. Simpson was the administrator of a fellowship program and handled faculty salaries. She was present at Dr. Pinter-Brown's yearly reviews and salary negotiation meetings. Also present were Dr. Slamon and Dr. Glaspy. Dr. Pinter-Brown was consistently lauded as an outstanding doctor. She had earned an international reputation as a leader in the field of lymphoma.

As the years went by, Ms. Simpson heard Dr. Pinter-Brown raise concerns in her review and salary negotiation meetings

about harassment by Dr. de Vos. Ms. Simpson described her own early interactions with Dr. de Vos, before Dr. Pinter-Brown joined UCLA, as unpleasant. He was very forceful and wanted Ms. Simpson to support his view of how his salary should be handled. Ms. Simpson felt he was misogynistic and expected women to be submissive to men. Ms. Simpson heard Dr. Pinter-Brown raise similar concerns about how Dr. de Vos treated her, specifically that Dr. de Vos was "ignoring her directives" and her "supervisory authority," and was "undermining her work." According to Ms. Simpson, Dr. Slamon and Dr. Glaspy told Dr. Pinter-Brown they would talk to Dr. de Vos and take care of the problem, but they never did anything. Ultimately, Ms. Simpson testified, she saw Dr. Glaspy and Dr. Slamon fail Dr. Pinter-Brown in preventing the discrimination and harassment she faced.

Ms. Simpson observed Dr. Slamon and Dr. Glaspy reprimand Dr. de Vos, telling him, "you have to cut out this shit." Dr. de Vos did not seem to take the admonishment seriously and maintained an attitude that he would do what he wanted. Ms. Simpson also observed Dr. de Vos behaving obsequiously toward Dr. Slamon and Dr. Glaspy in salary negotiation meetings, which she found inappropriate.

Ms. Simpson believed Dr. de Vos's sexism had something to do with the fact that he is German. She testified she is German and some of her male relatives do not think women belong in the work force and should be submissive to men. Dr. de Vos, she testified, had a similar manner about him. Ultimately, Ms. Simpson came to like Dr. de Vos despite her early unpleasant interactions with him. By the time she left UCLA in 2013, he had changed his behavior, for which she was grateful.

18

Ms. Simpson described Dr. Slamon as a "very, very nice man" who "made all of the people in the administration offices feel like they were part of something." She also testified she had a high opinion of Dr. Glaspy, whom she described as very nice. Ms. Simpson also stated she was on a first-name basis with all the doctors in the Hematology and Oncology Division.

### 3. Dr. Glaspy's Testimony

Dr. Glaspy, Assistant Chief of the Hematology and Oncology Division, testified that the Lymphoma Program's directorship was a responsibility rather than a power. Dr. Glaspy stated the director's job is to organize the group's meetings, oversee the business of the clinical research, and help the group decide which clinical protocols to undertake, which requires a consensus among the group's doctors.

Dr. Glaspy testified Dr. de Vos and Dr. Pinter-Brown frequently complained to him about each another. Although there were periods when everything seemed fine, there were also times they each complained the other was disrespectful and hostile. Dr. Glaspy testified Dr. Pinter-Brown complained about Dr. de Vos looking at his cell phone or turning his chair around at meetings and Dr. de Vos complained Dr. Pinter-Brown would not approve his protocols.

Dr. Glaspy testified Dr. Pinter-Brown complained about Dr. de Vos two to three times between 2008 and 2012. Dr. Glaspy communicated Dr. Pinter-Brown's complaints to Dr. de Vos as of February 2011. Dr. Glaspy stated Dr. Pinter-Brown told him about the March 2011 incident in which Dr. de Vos yelled at her. He believed it was Dr. Pinter-Brown who mentioned Title IX. Dr. Glaspy asked if she wanted to pursue her complaint as a Title IX issue and referred her to Dr. Tillisch. Dr. Glaspy learned both

19

Dr. de Vos and Dr. Pinter-Brown had been in contact with Dr. Tillisch, so he did not investigate the issue any further. In his view, Dr. Pinter-Brown and Dr. de Vos simply did not get along.

Dr. Glaspy testified Dr. Pinter-Brown also complained to him about two other male faculty members at UCLA. She complained one of the doctors was disrespectful; when Dr. Glaspy spoke to the doctor, the doctor stated Dr. Pinter-Brown had been disrespectful and dismissive of him. Dr. Pinter-Brown also complained about another male doctor who was "gruff." The other doctor said the same about Dr. Pinter-Brown. Dr. Glaspy stated she and the other doctor did not have a collegial relationship.

### 4. Dr. Slamon's Testimony

Dr. Slamon, Chief of the Division, also testified about the nature of the directorship of the Lymphoma Program. He stated Dr. de Vos was not Dr. Pinter-Brown's subordinate, even though Dr. Pinter-Brown led the program. Dr. Slamon stated directors serve the group, the group does not report to them, and directors do not have the authority to decide the direction of the program. Nor is the director supposed to give orders to the members of the group. Rather, the director organizes group meetings, engages the group, and facilitates group discussions about what direction the program should take. The director does not have the authority to tell the group members what to do or give them orders. "This is not a military organization," Dr. Slamon testified; rather, the group was instructed to make decisions by consensus.

Dr. Slamon testified he did not recall Dr. Pinter-Brown using the word "harassment" or characterizing her problems with Dr. de Vos as gender-specific when she complained about Dr. de

Vos. Dr. Pinter-Brown and Dr. de Vos had a very poor relationship and he admonished both of them individually. Dr. Slamon was very disappointed with their behavior. "I found that I had two faculty members," Dr. Slamon testified, "highly-paid, highly-educated faculty members who were behaving like preschoolers." Dr. Slamon stated he confirmed with other members of the Lymphoma Program that Dr. Pinter-Brown displayed the same behaviors as Dr. de Vos: she was argumentative and behaved inappropriately in making program decisions. After the group would reach a consensus about one of Dr. de Vos's proposed trials, for example, she would continue to argue his ideas were not valid. Other members of the group approached Dr. Slamon and told him this made them uncomfortable.

Dr. Slamon also testified he calls all his faculty by their first name and asks them to call him by his first name.

### 5. Dr. Timmerman's Testimony

Dr. Timmerman, a member of the Lymphoma Program, testified Dr. Pinter-Brown and Dr. de Vos did not get along. He stated they often bickered and contradicted each other, which was disruptive to the functioning of the group. Dr. Timmerman also corroborated Dr. Glaspy's and Dr. Slamon's testimony that the director of the Lymphoma Program is not in a supervisory position over the other members of the group. Each doctor functions individually and the director's role is to facilitate the administrative details that help the group run smoothly and help faculty members reach their goals. Being a director is a "loose" title; there is no hierarchy within the Lymphoma Program. Dr. Timmerman also noted although Dr. Pinter-Brown was a great clinician and doctor, the administrative role was not her "forte."

21

### 6. <u>Dr. de Vos's Testimony</u>

Dr. de Vos testified that, about a year into her directorship, Dr. Pinter-Brown began opposing trials he would try to bring into the Lymphoma Program. They had heated discussions when they disagreed, he would become irritated at the tone of the discussions, and it became known they did not like each other. Dr. de Vos complained to Dr. Glaspy, Dr. Slamon, and another doctor that he was irritated with Dr. Pinter-Brown's efforts to stop him from doing the trials he wished to undertake.

### 7. <u>Dr. Hiatt's Testimony</u>

Dr. Hiatt, Dean of Faculty, testified he met with Dr. Pinter-Brown once, had several telephone conversations with her, and had an extended email exchange with her over a period of months. Over the course of these communications, Dr. Hiatt stated, she never alleged harassment, discrimination, or retaliation to him directly. He did acknowledge that according to his notes from his face-to-face meeting with Dr. Pinter-Brown, Dr. Pinter-Brown told him Dr. Tillisch had admitted there were "different standard[s] for a man regarding behavior." Dr. Hiatt also testified Dr. Tillisch was not a Title IX officer but became aware that some people in the Department thought he was.

Dr. Hiatt was asked why he did not refer Dr. Pinter-Brown to the true Title IX officer, knowing Dr. Tillisch told Dr. Pinter-Brown there were different standards for men and woman. He reiterated Dr. Pinter-Brown did not frame her issues as gender-specific and stated he did not know at the time that Dr. Pinter-Brown was told Dr. Tillisch was a Title IX officer. Dr. Hiatt testified Dr. Pinter-Brown's chief complaint was that she was being retaliated against for complaining about Dr. de Vos in 2011.

8.  <u>Dr. Pregler's Testimony</u>

Dr. Pregler testified Dr. Tillisch reached out to her and another senior female faculty member, Dr. Currier, to help him evaluate Dr. Pinter-Brown's issues. Dr. Pregler stated the normal procedure would have been for Dr. Tillisch to complete the investigation himself and move forward with a decision. Since this issue involved a female faculty member, however, Dr. Tillisch thought speaking with senior female faculty members would help Dr. Pinter-Brown express any gender-related concerns.

Dr. Pregler testified she and Dr. Currier met with Dr. Pinter-Brown for approximately one hour. Exhibits indicate the meeting occurred sometime between March 2011 and July 12, 2012. After Dr. Pinter-Brown described her concerns, Dr. Pregler asked her specifically whether she felt any of it was related to her gender, and whether she thought her concerns should be taken outside the department to the ombudsman, who dealt with gender discrimination issues. Dr. Pregler recalled very clearly that Dr. Pinter-Brown said she did not feel her issues were related to gender, things were improving, and she did not feel that reaching out to the ombudsman "regarding gender issues was appropriate or something that she wanted to do." Dr. Pregler left the meeting believing Dr. Pinter-Brown was not concerned she was being treated differently because she was a woman.

Dr. Pregler testified she was aware Dr. Pinter-Brown had felt physically intimidated by Dr. de Vos, which was why she pressed Dr. Pinter-Brown on the gender issue to make sure she did not want to go to the ombudsman. Dr. Pregler also stated when she went to the meeting, she was "very open to the

possibility" that Dr. Pinter-Brown's complaints could be gender related because throughout her career she felt strongly about fighting gender discrimination. Dr. Pregler testified she respected Dr. Pinter-Brown as a colleague and accepted as true Dr. Pinter-Brown's statements that the issues with Dr. de Vos were not related to her gender.

### 9. Ms. Venegas's Testimony

Ms. Yanina Venegas was the Assistant Director of the Division of Hematology and Oncology, responsible for all administrative and financial matters. She worked directly under the Chief Operating Officer of UC Health. Ms. Venegas attended all of Dr. Pinter-Brown's salary negotiation meetings, along with Ms. Simpson. When asked whether Dr. Pinter-Brown ever claimed that she was being harassed by Dr. de Vos, Ms. Venegas replied, "Absolutely not." She recalls discussions about disagreements the two doctors had about clinical studies, but never got the impression Dr. Pinter-Brown felt she was a target of discrimination. Had Dr. Pinter-Brown made such a claim, Ms. Venegas testified, "that is something that we would have addressed immediately."

### B. UCLA's Oversight of Dr. Pinter-Brown's Research

Most of the meetings and events described above occurred no later than the end of 2012. Dr. Pinter-Brown argued at trial that UCLA retaliated against her for complaining about Dr. de Vos by subjecting her to audits of her clinical trials, which ultimately led to the temporary suspension of her research privileges and the loss of her title as Director of the Lymphoma Program. UCLA countered Dr. Pinter-Brown's allegation by presenting evidence of what it considered significant, ongoing

24

problems with Dr. Pinter-Brown's research and clinical trial activities.

    1.  <u>How UCLA Oversees and Monitors Clinical Trials</u>

Before discussing the evidence presented at trial about the audits of Dr. Pinter-Brown's clinical trials and the resulting consequences, an overview of the process by which UCLA monitors its clinical trials is warranted.

As part of its health campus, UCLA has a Jonsson Comprehensive Cancer Center (Cancer Center). The doctors at the Cancer Center conduct clinical trials. A clinical trial is a research study that explores whether a new medication is safe and effective for humans. It is led by a "principal investigator" who is responsible for everything that happens as part of the study. Clinical trials are closely controlled as they are experiments, which often involve a treatment that is new and unproven. For each clinical trial, a "protocol" is established which must be strictly adhered to. The protocol establishes a plan for treating participants safely, including exacting detail about the amount of medication to be administered and instructions for adjusting the dosage where necessary. If "serious adverse events" occur, the protocol typically requires the principal investigator to report the event to the trial sponsor within 24 hours.

A quality assurance team within the Cancer Center monitors and audits the Lymphoma Program's clinical trials. Monitoring of clinical trials by the quality assurance team happens in real time; as the trial is progressing, the team looks at the data, compares it to the research protocol to make sure everything is on track, and makes sure there are no deficiencies. Each trial has its own schedule to determine how often the trial

is monitored.  There should be no significant deviations from the protocol because the resulting data would be meaningless.  Monitoring reports are generated and given to the principal investigators of the trials, who are expected to resolve any issues by the time of the yearly audit.

Audits are a routine part of clinical trial research, and their purpose is to identify potential mistakes and problems.  Audits occur yearly.  The ultimate goals are patient safety and data integrity.  Audits are also conducted to make sure the FDA does not find significant issues with the conduct of clinical trials because if it does, it can bar an investigator from doing research.  The FDA can also put a hold on the entire institution and bar the institution from conducting more trials.

If there are issues identified in monitoring reports that are not resolved by the time of the yearly audit, a clinical monitor will sit down with the principal investigator, go through all the findings, and give the investigator time to resolve the problems.  Anything that is not resolved by the end of the audit then gets put into an audit report.  The report is sent to the principal investigator, who is expected to address point by point each issue not resolved by the time of the audit.

UCLA has two committees responsible for oversight of different aspects of clinical trials.  For clinical trials initiated by a faculty member and not sponsored by a pharmaceutical company (which sends its own monitors), these monitoring and auditing activities are overseen by UCLA's Data and Safety Monitoring Board (DSMB).  The DSMB oversees the data acquisition in clinical trials with a focus on patient safety.  The DSMB meets regularly to process "adverse event" notifications – the disclosure that a principal investigator must file for each event (such as a

side effect) involving patient safety.  It also reviews audit problems and ensures principal investigators respond to them. During the period at issue here, the DSMB consisted of about 20 doctors, nurses, statisticians, and administrators.  Dr. de Vos had been Chair of the DSMB since 2007.

The second committee is the Internal Scientific Peer Review Committee (ISPRC), set up by a mandate from the National Institutes of Health to closely review protocols for all clinical trials funded through a federal cancer center grant.  It approves clinical studies and controls faculty research privileges. The ISPRC ensures the protocols make sense mathematically and patient risk is kept to a minimum.  The ISPRC has at least 10 members representing various divisions within the Department of Medicine.  It has broad representation from all the clinical departments that treat cancer.  Between 2010 and 2012, it had about 20 members.

Audit reports are sent to the DSMB and the ISPRC; the reports list where a researcher fell short.  There are always deficiencies and discrepancies found in clinical trial audits.  One of the most important issues is how the principal investigator responds to the identified issues.  When the ISPRC receives audit reports, it looks for whether there are repeated problems that were identified in the past but are not resolving.  The ISPRC then decides whether more action is necessary.  Sometimes the ISPRC will assign a proctor to a researcher who is repeatedly making the same mistakes; other times it may suspend a faculty member's research privileges.

### 2. Audits of Dr. Pinter-Brown's Clinical Trials, Temporary Suspension of Her Research Privileges, and Loss of Her Title as Director of the Lymphoma Program

Dr. Sujna Raval-Fernandes oversaw clinical trials for the Cancer Center from 2007 to 2017 and conducted numerous audits of Dr. Pinter-Brown's trials. She testified there were no concerns about the audits of Dr. Pinter-Brown's trials prior to 2010. In 2008, for example, Dr. Raval-Fernandes found significant issues with one of Dr. Pinter-Brown's trials, but Dr. Pinter-Brown adequately addressed the issues.

Dr. Meghan Brennan, Director of Research in the Clinical Research Unit, testified that in December 2010, UCLA began to have concerns about Dr. Pinter-Brown's clinical trials. Dr. Judy Gasson and Robert Duwors, Director and Deputy Director, respectively, of the Cancer Center, recommended that the ISPRC review Dr. Pinter-Brown's audits. Among the concerns were Dr. Pinter-Brown was "extraordinarily delayed" in responding to serious questions about medication dosages, and her response to their question about a dose reduction was nonsensical. Another serious concern was that Dr. Pinter-Brown had instructed her staff not to wait for insurance authorization before seeing a patient which, as discussed further below, is a serious violation of UCLA policy.[3]

---

[3] The record includes an email Dr. Pinter-Brown sent to her staff on November 10, 2011, which includes the following sentence: "PLEASE DO NOT WAIT FOR INSURANCE AUTHORIZATION . . . I will see the patient for free."

On February 1, 2011, the DSMB convened a meeting and discussed, among other things, Dr. Pinter-Brown's October 27, 2010 response to an audit of one of her clinical trials. The DSMB concluded it needed more information about a medication dose reduction that was done contrary to protocol because Dr. Pinter-Brown's initial response was unclear, conflicting, and incomplete. The DSMB also indicated it wanted Dr. Pinter-Brown to provide assurances that she reported the violations to UCLA's institutional review board.

Dr. Raval-Fernandes was at the DSMB's February 1, 2011 meeting. She testified she had conducted the audit under review at the meeting and found treatment delays and drug dose reductions contrary to protocol. She stated a change in drug dosage contrary to the study's protocol is very significant because it compromises both patient safety and data integrity. Dr. Raval-Fernandes presented her findings about the September 2010 study to the ISPRC because there were "major issues" with the clinical trial that Dr. Pinter-Brown did not adequately address.

Dr. de Vos testified he was at the meeting, but would have recused himself during the discussion of Dr. Pinter-Brown's audits. Dr. Glaspy also testified Dr. de Vos would have been excluded from the room during this discussion because, as a member of the Lymphoma Program, he would have been considered a co-investigator or "sub" principal investigator. Dr. Raval-Fernandes testified she recalled Dr. de Vos was present throughout the entire meeting.

Terra Hughes, Administrative Director of the Cancer Center, drafted a letter from the DSMB to Dr. Pinter-Brown asking her to respond to these concerns and provide additional information. Her initial draft of the letter included Dr. de Vos's

electronic signature, and she sent it to him for his approval on February 4, 2011 at 9:22 a.m. At 9:36 a.m., she sent a revised version of the letter to Dr. Glaspy, which contained his electronic signature in place of Dr. de Vos's. In her email to Dr. Glaspy, she stated she was asking Dr. Glaspy to sign the letter since Dr. de Vos was "a conflict on the study" and Dr. de Vos felt he should not sign the letter.

On February 9, 2011, Dr. Robert Elashoff, Chair of the ISPRC, wrote a letter to Dr. Pinter-Brown informing her it had convened a meeting on February 1, 2011 and reviewed her clinical research history, including audit and monitoring reports. The committee "expressed concern regarding patterns of violations and missing regulatory documents in [her] clinical trials" overseen by the DSMB. Dr. Elashoff informed her that because of these concerns, the ISPRC requested additional audits of two of her trials not overseen by the DSMB.

On February 11, 2011, Dr. Raval-Fernandes followed up with Dr. Pinter-Brown about the audit the DSMB discussed at its February 1, 2011 meeting involving unauthorized drug dose reductions and inadequate responses. Dr. Raval-Fernandes testified it took Dr. Pinter-Brown over four months to respond. And, Dr. Pinter-Brown's responses to the dose reduction issue were contradictory and did not make sense. Additionally, Dr. Pinter-Brown attributed some of the dose reductions to a misunderstanding on the part of the study coordinator—an unsatisfactory response because the principal investigator is expected to take responsibility for patients receiving the study drugs. Overall, therefore, Dr. Raval-Fernandes found Dr. Pinter-Brown's responses unsatisfactory.

In July 2011, the ISPRC determined Dr. Pinter-Brown's research conduct as a principal investigator was "lacking with regards to oversight and management." Specifically, the ISPRC found continuing problems with informed consent and Dr. Pinter-Brown's "incomplete and unclear" responses to the audit findings. As a result, the ISPRC assigned Dr. Pinter-Brown a mentor to provide her with guidance, support, and re-training for six months.

On January 12, 2012, the ISPRC wrote Dr. Pinter-Brown a letter documenting its concerns about an audit of another one of her clinical trials. Dr. Pinter-Brown had blamed delayed study visits and evaluations on "insurance issues." The ISPRC warned her it was a "major violation" for a researcher to register a patient for a study without insurance because doing so could impede the patient's "unfettered access to physicians and treatments for medical problems that arise while on clinical trials." The ISPRC also told Dr. Pinter-Brown her responses regarding another patient were "very concerning" because she placed blame for a protocol deviation on her subordinate research staff. "It is a fundamental principle regulating clinical research that the investigator is ultimately responsible for all study procedures and adherence to protocol in all its respects," stated the letter. The ISPRC further explained attributing a deficiency to subordinate staff "in effect means that you failed to provide adequate oversight of study personnel on this patient." The ISPRC went on to admonish Dr. Pinter-Brown that: "This principle of investigator responsibility has been made clear, in writing to all . . . investigators, including yourself in the past. This breach of your duty to supervise and your apparent failure to understand that it is your duty, is especially disconcerting,

given that it occurred during a period in which you were already on probation for prior breaches of investigator duty, with oversight for consent procedures by another faculty member." The ISPRC asked Dr. Pinter-Brown for a "detailed action plan" to ensure the deficiencies noted during the audit will not recur. "In crafting your response," the letter stated, "be aware that the committee believes that there are safety issues for patients arising out of these most recent violations and seeks to be convinced that protocols you supervise will be rigorously followed."

Dr. Pinter-Brown was mentored for six months. On January 24, 2012, about two weeks after the ISPRC letter requesting a "detailed action plan," Dr. Pinter-Brown's assigned mentor, Dr. Bartoaz Chmielowski, submitted a detailed report to the ISPRC documenting his oversight of her research activities. He concluded she proved she would be a "skilled and responsible principal investigator." Dr. Chmielowski indicated Dr. Pinter-Brown went through a thorough consenting process with the patients, maintained complete notes, regularly communicated with staff, and addressed problems as they arose. He recommended the ISPRC allow Dr. Pinter-Brown to research independently without a mentor.

One month later, in February 2012, ISRPC found an additional problem with a clinical trial for a pharmaceutical company. A serious adverse event occurred with one of the patients in a Pfizer study and Dr. Pinter-Brown failed to report it within the required 24 hours. On February 24, 2012, Dr. Pinter-Brown was told she needed to report the adverse event within the required time-frame; she submitted an incomplete report three business days later. The full report was not submitted to Pfizer

until March 29, 2012. The company therefore "shut down" the trial.

On April 3, 2012, the ISPRC met with Dr. Pinter-Brown. She explained she had written up the adverse event form promptly and took pains to make sure it was accurate. She stated it had taken three days to finish the report. She stated she had given the report to her staff to submit and did not know it had been submitted so late. Dr. Glaspy therefore read the paragraph from the ISPRC's January 12, 2012 letter (discussed above) detailing the importance of a principal investigator being accountable and taking personal responsibility for protocol deviations rather than blaming subordinate staff.

Dr. Glaspy then asked Dr. Pinter-Brown whether there had been significant protocol violations in her studies; she acknowledged there were, but disagreed any had occurred since she completed her mentoring. Additionally, the minutes from the meeting reveal the ISPRC and Dr. Pinter-Brown could not agree on whether her failure to ascertain whether the adverse event report had been submitted timely constituted a breach on her part. Finally, at the April 3, 2012 meeting Dr. Pinter-Brown stated it was "not clear" from the January 12, 2012 letter that she was expected to provide the committee with a detailed corrective action plan. She apparently felt there was "room for reasonable minds to differ" about the meaning of a paragraph in the letter in which the following sentence appears: "In your response to this letter, please provide a detailed action plan for ensuring that the deficiencies noted during the audit will not recur in the future and that you understand and accept that you are personally responsible for the execution of your studies."

Dr. Sara Hurvitz, a breast cancer physician at UCLA, is a voting member of the ISPRC and was present at the April 3, 2012 meeting. She testified that early in her career, she had a lot of problems with a clinical trial on which she was the principal investigator. She discovered multiple protocol deviations and was called in to the ISPRC. She was expected to explain herself at the meeting. She asked for guidance from more experienced physicians, began a clinical research course, changed her behavior, and was ultimately asked to sit on the ISPRC. She also began training new physicians and retraining more seasoned investigators who ran into the types of problems she did.

Dr. Hurvitz testified that, in preparation for the April 3, 2012 meeting, she learned Dr. Pinter-Brown had repeated mistakes in executing the protocols on her trials and there was not an action plan to correct the problems. Despite being given multiple chances—she had at least seven audits and a mentorship—Dr. Pinter-Brown's patient care in clinical trials was still "alarming," particularly because Dr. Pinter-Brown did not report the significant adverse event to Pfizer and to UCLA's ethics committee in a timely manner.

Dr. Brennan was also present at the April 3, 2012 meeting. She testified Dr. Pinter-Brown was not honest at the meeting about what transpired with respect to the adverse event. Dr. Brennan testified that although Dr. Pinter-Brown told the committee the adverse event had been reported, Dr. Pinter-Brown had actually told Dr. Brennan she did not believe the event needed to be reported so she did not report it. According to Dr. Brennan, Dr. Pinter-Brown gave a "variety of responses that were not . . . consistent."

There were eight doctors at the April 3, 2012 meeting, not including Dr. Pinter-Brown. At the end of the meeting, Dr. Pinter-Brown was asked to leave the room so the committee could vote on how to proceed. Dr. Brennan had to leave the meeting at this point, so she did not cast a vote. The remaining seven committee members were offered three options: (1) restore Dr. Pinter-Brown to unsupervised principal investigator status; (2) provide Dr. Pinter-Brown with six more months of proctoring and only allow her to be involved as an investigator in clinical trials; and (3) revoke Dr. Pinter-Brown's privileges to participate in any clinical trials for at least one year, allowing her to do extensive training on research methods and reapply for privileges in the future. None of the members voted for the first option. Four members voted for the second option, and three voted for the third.

Dr. Glaspy prepared the minutes of the meeting and sent them to Dr. Brennan and other members of the ISPRC. In his email to Dr. Brennan, he wrote: "Vote was 4 for purgatory, 3 for hell. Both Bob E [Robert Elashoff, ISPRC Chair] and I voted for the death penalty. She missed the firing squad by one vote." In one of her replies, Dr. Brennan expressed frustration that Dr. Pinter-Brown was not forthcoming about not reporting the adverse event and she stated, "I should have stayed and split the vote!"

Dr. Brennan told Dr. Glaspy she wanted to cast her vote. Dr. Glaspy, Dr. Gasson, head of the Cancer Center at the time, and Sandra Binder, a registered nurse and the Director of Qualify Research at UCLA, allowed Dr. Brennan to vote because she had been present for the entire meeting. Dr. Brennan asked Dr. Gasson if additional committee members who were not

present at the meeting could vote; the answer was no. Dr. Brennan voted to suspend Dr. Pinter-Brown's privileges. Dr. Brennan testified she asked to register her vote because she had been "present for all of this, and [she] had an opinion," and she wanted her opinion to be heard. "I was concerned," she testified.

Because the vote ended in a tie, which had never before happened in the ISPRC, Dr. Glaspy sent their findings to Dr. Slamon at the Hematology Division and to the Cancer Center. The issue was brought to Dr. Fogelman, Chief of Medicine, who sent the findings to Dr. Michael Roth, the Department of Medicine's Compliance Officer, for an independent review. Dr. Glaspy emailed Dr. Fogelman on April 9, 2012 to let him know he thought it was an excellent idea to have Dr. Roth review the matter. Dr. Glaspy testified he thought it was an excellent idea because it allowed a "fresh set of eyes" to look at the issue and "give more due process in this tough situation."

Dr. Roth concluded "corrective actions" would be "more likely to result in a positive outcome" than the complete suspension of Dr. Pinter-Brown's privileges.

On July 3, 2012, the ISPRC met again and voted unanimously, 9-0, to suspend Dr. Pinter-Brown's research privileges for one year due to "problems with the informed consent process, missing source documentation, dosing errors, repeated protocol violations, lack of responsiveness to the Committee (including providing misleading information), and a general lack of study oversight and management." Dr. Glaspy recused himself from the vote on the recommendation of Dr. Hiatt, Dr. Gasson, and Sandra Binder. The ISPRC informed Dr. Pinter-Brown she would be able to continue to see subjects currently enrolled in her trials with the oversight of a mentor,

36

and she was required to undergo additional training through UCLA's Clinical Research Unit.

After reviewing the findings from the ISPRC, and the correspondence between the ISPRC and Dr. Pinter-Brown, Dr. Slamon wrote Dr. Pinter-Brown notifying her that Dr. Jonathan Goldman would mentor her during the one-year suspension period.  Dr. Slamon told Dr. Pinter-Brown Dr. Brennan would assist her in meeting the ISPRC's expectations and he "st[oo]d ready" to assist her in meeting their requirements and to facilitate her coming into compliance with the ISPRC rules and regulations.  Dr. Slamon also informed Dr. Pinter-Brown he would be naming an Acting Director for the Lymphoma Program during Dr. Pinter-Brown's suspension because he felt it would be a significant challenge for her to "adequately and appropriately represent the Lymphoma Program in its critical mission of clinical/translational research with outside sponsors and regulatory bodies as well as co-operative groups and collaborators both within UCLA and at outside institutions."  Dr. Slamon assured this decision would have no impact on her academic rank, merit actions, or salary.[4]

---

[4]      By contrast, Dr. Pinter-Brown testified she attended a meeting in which Dr. Slamon threw a book containing all  her ISPRC audits on the table, and said, "we don't want someone like you representing the UCLA lymphoma program.  From this moment forward, you are no longer the director."  Dr. Pinter-Brown's testimony does not specify the date of this meeting.  Dr. Pinter-Brown also testified this meeting had been set up after she reached out to speak with the ombudsman.  Dr. Pinter-Brown testified she told the ombudsman she wanted a one-on-one meeting with Dr. Slamon.  The ombudsman told her, "Dennis is very candid and he only wants to have a meeting about going

Dr. Slamon appointed Dr. de Vos Interim Director of the Lymphoma Program. Dr. Glaspy testified he "didn't really have a say-so" in the decision, but he "agreed reluctantly."

Dr. Pinter-Brown implemented a corrective action plan to improve her research capabilities. Her assigned mentor, Dr. Goldman, informed the ISPRC on February 18, 2013 she fulfilled her informed consent responsibilities, was "generally excellent regarding timely review of laboratory and radiology results," and "promptly identified study deviations." Dr. Goldman concluded Dr. Pinter-Brown was an excellent lymphoma doctor, recommended she continue to participate in clinical trials, and stated he believed she had the capability to be a principal investigator.

---

forward." Dr. Pinter-Brown testified it made her uncomfortable when the ombudsman called Dr. Slamon "Dennis" because it made it sound "like they were buds." Dr. Pinter-Brown testified the ombudsman set up the meeting at her request but when she arrived it was in a room with glass walls on three sides, had been catered, and included not only Dr. Slamon, but also Dr. Glaspy, Dr. Brennan, and the ombudsman. She testified she was told she was not allowed to discuss what happened with Dr. de Vos and that the meeting was only about her research issues going forward. Dr. Pinter-Brown testified she had to leave the room momentarily because she began to cry and had to pull herself together. At some point after she returned, Dr. Slamon threw the book on the table and told her she could no longer be the director. Although Dr. Brennan, Dr. Glaspy, and Dr. Slamon testified at trial, no testimony was elicited from any of them about this meeting.

On October 30, 2013, the ISPRC returned Dr. Pinter-Brown to her principal investigator status on a limited number of studies. Dr. Glaspy testified he was present at the ISPRC meeting when this decision was made and "everybody agreed" to the partial restoration of her research privileges.

On April 15, 2014, Dr. Slamon and Dr. Glaspy named Dr. de Vos Director of the Lymphoma Program. Dr. Glaspy testified that, at that point, he did not have any reservations about Dr. de Vos directing the program.

In July 2014, Dr. Pinter-Brown called Sandra Binder and asked her to review a patient's chart because she was concerned about a possible chemotherapy overdose. Ms. Binder looked at the chart and was "devastated" because the patient received a dangerously high dose. Dr. Hurvitz was alerted about the incident. She testified Dr. Pinter-Brown gave the patient 12 weeks of a highly toxic chemotherapy in four consecutive days. As a result, Dr. Pinter-Brown was asked to complete training on how to appropriately place patients on chemotherapy orders.

Dr. Pinter-Brown testified she was not responsible for the chemotherapy overdose. She testified UCLA had put in new software to write chemotherapy orders and that Sandra Binder, who "was supposed to be helping us with it," often did not return calls because "there was so much going on." When Dr. Pinter-Brown's nurse practitioner asked her if he could write the chemotherapy order, she testified, she told him he could write it but not to sign it before showing it to her. When he showed her the order, Dr. Pinter-Brown saw he had written a very confusing order. She spent 40 minutes with him and worked on the order with him until it looked correct. "And then we signed them," she testified, "and the patient got his chemotherapy without any

problem.  It was perfect."  When the next round of chemotherapy came up for this patient, her nurse practitioner asked her if he could write the order.  She agreed, but only if he copied and pasted what they wrote in the previous order into the new one.  He agreed to do so, but "for reasons that I do not understand," Dr. Pinter-Brown testified, he "wrote different orders."  Dr. Pinter-Brown also testified she allowed her nurse practitioner to write the second order because, a year earlier, Dr. Slamon had told her to stop "micromanaging" her nurse practitioner.  When asked directly whether she signed the order, she replied, "I don't believe so.  I think [the nurse practitioner] signed it."

Dr. Pinter-Brown notified Sandra Binder, Dr. Glaspy, and others about the chemotherapy dose.  When her counsel asked if "the powers that be" attempted to blame her for this incident, Dr. Pinter-Brown replied, "Yes."  She testified Dr. Slamon convened an emergency meeting of the Division and began the meeting by telling everybody about the history of the division, how proud he was of it, and that "one person in the division would being the entire division down by making a chemo error."  "It was humiliating," Dr. Pinter-Brown testified.  Dr. Pinter-Brown testified she and her nurse practitioner were then required to take a class on how to write chemotherapy orders.

Despite the chemotherapy overdose, the ISPRC decided on October 20, 2014 to fully restore Dr. Pinter-Brown to principal investigator status without limitations.  In its letter, the ISPRC stated it "appreciates the efforts [Dr. Pinter-Brown] made to further clinical research at UCLA."

In January 2015, Dr. Hurvitz requested a meeting with Dr. Pinter-Brown because there was another problem with a patient's chemotherapy order.  Dr. Hurvitz testified there were issues with

40

Dr. Pinter-Brown's orders and notes, which "didn't make sense," causing the patient to have to wait 12 hours in the ward being hospitalized without receiving chemotherapy while the order was sorted out. At the meeting were Dr. Hurvitz, Sandra Binder, Dr. Slamon, and Dr. Rosen, the director of the inpatient practice. According to Dr. Hurvitz, the meeting was cordial. Dr. Pinter-Brown was offered resources to help her avoid another "chemotherapy order mishap."

Dr. Pinter-Brown testified that, overall, she believed the audits of her clinical trials were initiated in February 2011 in retaliation for complaining about Dr. de Vos. Although she did not complain about Dr. de Vos until March, 2011, she notes that Dr. Glaspy had confirmed he received complaints from her as early as 2008. She testified there were never any serious problems with the audits of her clinical trials before 2011. Dr. Hiatt, Dr. Glaspy, and Dr. Raval-Fernandes, who oversaw clinical trials for the Cancer Center from 2007 to 2017, confirmed none of Dr. Pinter-Brown's audits were problematic before 2011. Dr. Pinter-Brown testified she was suddenly subjected to "random audits" in April 2011, and she found it "very odd, the timing of it," that she was suddenly being audited one month after complaining after Dr. de Vos, considering he chaired the DSMB.

Dr. Pinter-Brown testified Dr. Slamon, Chief of Hematology, failed an FDA audit, a very serious event because it attracts the government's attention to the institution, which can lead to clinical trials being shut down. Yet, he never suffered adverse consequences. One of Dr. Eradat's clinical trials was suspended after an audit in 2011 or 2012, as was one of Dr. Timmerman's around the same time. Both are on the Lymphoma Program team. Yet, they did not suffer adverse consequences.

41

Dr. Pinter-Brown stated she knew of only one man who lost research privileges because of negative audit findings.

Dr. Glaspy testified at least five male doctors had research privileges removed by the ISPRC.

Finally, according to Dr. Pinter-Brown, even after her research privileges were fully restored, she did not have as many clinical trials. She stated Dr. de Vos continued to prevent her from talking at meetings and, on several occasions, would not allow a sponsor to visit the institution, which is a prerequisite for initiating some clinical trials. She continued to complain to Dr. Glaspy about Dr. de Vos to no avail.

Dr. Pinter-Brown also testified she had far fewer teaching fellows assigned to her after Dr. de Vos assumed the directorship. Dr. Sarah Larson, the Director of the Fellowship Program, joined the Lymphoma Program in 2013 and is responsible for assigning fellows to clinics. She testified assignments are made based entirely on prospective fellows' requests. She stated neither she nor anyone else ever decided not to pair a fellow with Dr. Pinter-Brown. Additionally, Dr. Timmerman testified that, around this time, there was a shift in how fellows were distributed to clinics. Many fellows were being sent to rotations in community practices to experience "bread-and-butter oncology" rather than deal with the "more esoteric" cases the physicians saw at UCLA. Dr. Timmerman testified that, as a result, he did not have many fellows in his clinics even though he won a teaching award; he also testified all the physicians in their clinics had less support from fellows.

Dr. Pinter-Brown testified she was still called by her first name after her privileges were restored whereas male doctors were addressed as "Doctor." Dr. Larson testified it was common

for doctors in the Lymphoma Program to refer to each other by first name in "most settings." In front of patients, she testified, they would use the title "Doctor." In other settings, including some formal settings, they would "usually say 'Lauren,' 'Sven,' [or] 'Dennis.' "

On November 23, 2015, Dr. Pinter-Brown filed a complaint with the California Department of Fair Employment and Housing (DFEH), and resigned from UCLA effective December 31, 2015. She accepted a position at UC Irvine beginning January 1, 2016.

### C.     Motion to Amend the Complaint, Verdict, Damages

On February 5, 2018, in the middle of trial, Dr. Pinter-Brown filed a motion for leave to amend her operative complaint according to proof, asking the court to permit her to add a cause of action for retaliation. Dr. Pinter-Brown attached a proposed complaint adding a cause of action for "retaliation for opposing discrimination and/or harassment on the basis of gender in violation of FEHA."

On February 13, 2018, after both sides had presented all their evidence to the jury, the court heard argument on the motion. UCLA argued the claim had already been summarily adjudicated against Dr. Pinter-Brown. Dr. Pinter-Brown argued the "substance was different" than how she originally pled retaliation in the complaint and that they were pursuing a retaliation theory under different subsections of FEHA. UCLA argued strenuously that Dr. Pinter-Brown was not alleging new facts or new legal theories beyond what was included in the original complaint and that allowing her to re-allege retaliation at this late stage after the court had summarily adjudicated it in UCLA's favor caused UCLA undue prejudice.

43

Both complaints assert a cause of action for retaliation under Government Code sections 12900 et seq. and 12940 et seq. There are no different or additional subsections pled in the amended complaint. The trial court allowed Dr. Pinter-Brown to add the retaliation claim. It did not state its reasoning for resurrecting a cause of action it had already adjudicated other than to say, "I . . . don't think it makes a particular amount of difference. I would indicate a couple of things: if the jury comes back with a finding for the plaintiff on all of the causes of action, I am not sure the amendment makes any difference at all. If they find for discrimination and harassment and also retaliation, it becomes superfluous because the jury will be instructed they can't award duplicative damages. [¶] If the jury were only to come back on the retaliation claim as opposed in any of the other claims, I assume there will be a motion for J.N.O.V. and the court will consider that issue. So I am not sure that it's dispositive one way or the other at this point."

The jury was given a general verdict form. On February 15, 2018, the jury returned verdicts in favor of Dr. Pinter-Brown on the discrimination and retaliation claims. The court then polled the jury, which had voted 10 to 2 on each claim.

On March 22, 2018, the jury awarded Dr. Pinter-Brown a total of $13,011,671 in damages: $635,612 in past economic loss, $2,376,059 in future economic loss, $7 million in past non-economic loss, and $3 million in future non-economic loss.

### D. *Appeal and Motion to Strike*

UCLA timely appealed, alleging: (1) Dr. Pinter-Brown did not prove she suffered an adverse employment action within the statute of limitations; (2) judgment should be entered for UCLA as a matter of law because neither discrimination nor retaliation

44

was a substantial motivating reason for any adverse action; (3) a new trial is warranted because the court framed the case in grossly prejudicial terms, then admitted allegations of unrelated discrimination; (4) the court improperly submitted Dr. Pinter-Brown's retaliation claim to the jury months after summarily adjudicating that claim in UCLA's favor.

During the pendency of this appeal, Dr. Pinter-Brown filed a motion to strike portions of UCLA's opening brief. She first asks that we strike a paragraph that cites factual assertions in websites that were never admitted or seen by the trial court. After reviewing the record, we have determined the trial court record does not include the material on these websites. Accordingly, we strike the paragraph of UCLA's brief referring to these websites. "[A]ppellate review is limited to the record that was before the trial court." (*Preserve Poway v. City of Poway* (2016) 245 Cal.App.4th 560, 567, fn. 2*;* See also *C.J.A. Corp. v. Trans-Action Financial Corp.* (2001) 86 Cal.App.4th 664, 673.)

Dr. Pinter-Brown also asks us to strike references to parts of Exhibit 69, which is a 233-page exhibit documenting UCLA's audits and oversight of Dr. Pinter-Brown's clinical research. Dr. Pinter-Brown alleges the exhibit was not admitted in its entirety and UCLA relied on portions of the exhibit that were "never published or discussed with the jury." We find no evidence to support this assertion.

Before trial, the parties stipulated to admitting Exhibit 69; Dr. Pinter-Brown did not ask for any limitation on the document's admissibility. On January 30, 2018, the court entered Exhibit 69 into evidence without limitation or exception. On February 1, 2018, UCLA first presented the exhibit to the jury; the transcript reflects the exhibit was admitted into

45

evidence. Finally, the record reflects the full exhibit was marked as admitted. At no point did the court indicate only portions of Exhibit 69 had been admitted. We therefore decline to strike any portions of UCLA's brief referring to or relying on Exhibit 69.

## DISCUSSION

We conclude the court erred by framing the case at the outset in prejudicial terms, allowing the jury to hear evidence of racial discrimination at UCLA, allowing into evidence a list of all types of discrimination complaints against the entire University of California system and its ten campuses, and allowing Dr. Pinter-Brown to re-allege a cause of action for retaliation despite summarily adjudicating the same issue prior to trial. These errors were cumulative and highly prejudicial.

Accordingly, we reverse. Because we reverse on these bases, we do not address UCLA's allegations that Dr. Pinter-Brown did not suffer an adverse employment action or constructive discharge; that neither discrimination nor retaliation were substantial motivating factors for UCLA's actions; that all claims are barred by the applicable statute of limitations; and that the trial court erred in instructing the jury.

## I.      Trial Court Comments

"Trial judges 'should be exceedingly discreet in what they say and do in the presence of a jury lest they seem to lean toward or lend their influence to one side or the other.' " (*People v. Sturm* (2006) 37 Cal.4th 1218, 1237–1238.) A judge's conduct must " ' " ' "accord with recognized principles of judicial decorum consistent with the presentation of a case in an atmosphere of fairness and impartiality," ' " ' " and " ' "[t]he trial of a case should not only be fair in fact, . . . it should also appear to be fair." ' "

46

(*Haluck v. Ricoh Electronics, Inc.* (2007) 151 Cal.App.4th 994, 1002.) "Jurors rely with great confidence on the fairness of judges, and upon the correctness of their views expressed during trials. For this reason, and too strong emphasis cannot be laid on the admonition, a judge should be careful not to throw the weight of his judicial position into a case, either for or against the defendant." (*People v. Mahoney* (1927) 201 Cal. 618, 626–627.)

Indeed, the third canon of our Judicial Code of Ethics admonishes us to "perform judicial duties without bias or prejudice," and to refrain from engaging in speech that would reasonably be perceived as bias or prejudice. (Cal. Code Jud. Ethics, canon 3B(5).) Additionally, standard 10.20 of the California Rules of Court's Standards of Judicial Administration instructs us to "preserve the integrity and impartiality of the judicial system" by ensuring courtroom proceedings "are conducted in a manner that is fair and impartial to all of the participants." (Cal. Stds. Jud. Admin., std. 10.20(a) & (a)(1).)

Here, the trial court's remarks to the jury violated these principles and gave the appearance that the court was partial to Dr. Pinter-Brown's causes of action. (The court's remarks are attached to this opinion as Appendix A, *post*, starting on page 70.) In conjunction with the other errors discussed below, the court's introductory presentation rendered the trial fundamentally unfair to UCLA.

The court framed this case as part of a centuries-long fight against discrimination and inequality. The court not only invoked the words of Dr. Martin Luther King, one of our nation's most respected and revered civil rights leaders, it also quoted one of the most well-known lines from Dr. King's famous and venerated "I Have a Dream" speech. At the apogee of the civil

47

rights movement, Dr. King told the world that the "arc of the moral universe bends toward justice." Here, the judge told the jury it was *their job to be* Dr. King and to help bend that arc.

When UCLA objected to the court's lengthy recitation of our country's history of fighting discrimination and its description of the heroism of the individuals who led those efforts, the court insisted its presentation was not improper or prejudicial because the prospective jurors were told that the lauded civil rights figures were sometimes plaintiffs and sometimes defendants. We are not persuaded. Regardless of whether Rosa Parks, Elizabeth Jennings, Delores Huerta, or any of the other civil rights icons highlighted in the court's presentation were plaintiffs or defendants, the message was clear: each of them was fighting to right the grave and historic wrong of discrimination. By telling the jurors *they* were Dr. King, the court told them they were also there to right a wrong. Each case cited by the court was another step in the right direction: toward equality and away from discrimination. The court's message was clear: the jury's job was to continue in that great, noble, and *moral* tradition of pushing society toward equality.

We appreciate the difficulties faced by trial courts in putting together juries of 12 impartial and willing people. The difficulties are compounded by prospective jurors who are openly loathe to serve not because they cannot be impartial, but because jury service otherwise interferes with their lives. It is exceedingly difficult to be gracious to those potential jurors who enjoy the benefits of living in our free society of, by, and for the People, but who won't embrace the civic responsibility, one of only a few, that underpins our democracy. It is remarkable that our trial courts, in the face of such daily recalcitrance to serve,

48

not only remain gracious, but enthusiastically promote the opportunity to serve by touting to prospective jurors the importance of the court's call to duty.

However, the remarks of the trial court here were not an impartial call to duty; they were a resolute and stirring call to action which stacked the deck against UCLA. It was a grave error for the court to begin a gender discrimination trial with a presentation highlighting the great achievements our nation's civil rights leaders have made toward creating a world free of discrimination and telling the prospective jurors they were carrying on that quest. Although particularly prejudicial in a discrimination case, we believe the court's comments and call to action are inappropriate in any case. This error was but one of a series of errors that prejudiced UCLA and rendered the trial fundamentally unfair.

## II. "Me Too" Evidence

Throughout trial, the court allowed Dr. Pinter-Brown to present the jury with unrelated claims of discrimination at UCLA. First, it allowed Dr. Pinter-Brown to introduce evidence, through witnesses, of a report detailing the findings of a 2012 investigation into incidents of racial discrimination at UCLA. The court also admitted into evidence a list of all DFEH complaints against the entire University of California system from July 1, 2012 to August 17, 2017.

This type of evidence—evidence that an employer waged the same type of discrimination against other employees as is it did against a plaintiff—is called "me too" evidence. As discussed below, "me too" evidence can be admissible only to prove intent and motive, among other things, with respect to the plaintiff's own protected class. Additionally, the admissibility of "me too"

evidence hinges on how closely related the evidence is to the plaintiff's circumstances and theory of the case. "Me too" evidence is never admissible to prove an employer's propensity to harass. Yet, that is exactly what the court allowed Dr. Pinter-Brown to do.

### A. The Moreno Report

On October 15, 2013, retired California Supreme Court Justice Carlos Moreno submitted to UCLA a report entitled, "Independent Investigative Report on Acts of Bias and Discrimination Involving Faculty at the University of California, Los Angeles." The Executive Summary makes clear the report is the culmination of an investigation into "racial and ethnic bias and/or discrimination" at UCLA, *not* gender discrimination or bias. The report concluded UCLA's policies and procedures for responding to incidents of racial and ethnic bias, discrimination, and intolerance were inadequate, and provided recommendations for improvement.

Although the court did not allow the report into evidence, it permitted Dr. Pinter-Brown to ask multiple witnesses about the report and impermissibly allowed the contents of the otherwise-inadmissible report to come in through these testifying witnesses.

During Dr. Glaspy's testimony on February 7, 2018, Dr. Pinter-Brown asked, "[a]re you familiar with a public report published in late 2013 investigation, in particular, UCLA's bad policies involving antidiscrimination claims that they sweep under the rug and deeming these interpersonal conflict?" The court sustained UCLA's objection to the question. Dr. Pinter-Brown then asked, "[a]re you familiar with the fact that there was an independent investigation done about [UCLA] in particular, of all the [UC] schools, in 2013 about how it handles

discrimination claims?" The court sustained UCLA's objection as assuming facts not in evidence and stated, "[y]ou can certainly ask him if he's familiar with the Moreno report." Dr. Pinter-Brown asked Dr. Glaspy, "[a]re you familiar with an investigation that occurred at [UCLA] in to [*sic*] how the University handled discrimination issues," to which Dr. Glaspy replied, "No."

Then Dr. Hiatt, Dean of Faculty, was asked about the report during his testimony on February 7, 2018. Dr. Hiatt admitted familiarity with the Moreno report. Dr. Pinter-Brown asked him whether, in the report, "the policies that were applied to Dr. Pinter-Brown by [UCLA] were condemned as ineffective." UCLA objected under Evidence Code section 352 and on hearsay grounds; the court sustained UCLA's hearsay objection.[5] Dr. Pinter-Brown moved to have the report admitted into evidence, UCLA objected, again on section 352 and hearsay grounds. The court replied, "not under [section] 352, but as to hearsay, the court will sustain the objection." Dr. Pinter-Brown then prompted Dr. Hiatt to state the Moreno report was prepared by a retired justice from the California Supreme Court.

Proceeding apace, Dr. Pinter-Brown then asked Dr. Hiatt, "the findings of this report were very damning to the discrimination going on at [UCLA]; correct?" Dr. Hiatt replied, "[w]ell, it certainly identified opportunities for improvement."

_____

[5]    Under Evidence Code section 352, the court may exclude evidence if its "probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

Dr. Pinter-Brown then stated, "[f]irst of all, it concluded that 'UCLA's nondiscrimination," at which point UCLA interrupted with an objection to Dr. Pinter-Brown reading from the document. The court sustained the objection.

Shortly thereafter, Dr. Pinter-Brown started to ask, "the report concluded that [UCLA] was labeling discrimination and bias as interpersonal conflicts," at which point UCLA objected as leading and hearsay. The court overruled the objections. "The very language we heard from Dr. Glaspy," Dr. Pinter-Brown continued, "that they were labeling discrimination and harassment and retaliation as interpersonal conflicts; correct?" Dr. Hiatt replied he did not remember that level of detail. Dr. Pinter-Brown then attempted to get a paragraph of the Moreno report in as a party admission; the court denied the request. Dr. Pinter-Brown therefore paraphrased the paragraph by stating, not in the form of a question, "[i]t identifies a tendency to treat reports as interpersonal conflicts, and other things that it lists." UCLA objected again to Dr. Pinter-Brown reading from the document. "Sustained," the trial court replied, "if you're reading from the document." Dr. Pinter-Brown then said, "I'm not reading from the document." The court replied, "Okay."

Dr. Pinter-Brown continued, "[i]t lists two things. It says, in essence, [UCLA] is misclassifying discrimination, harassment, retaliation as, number one, interpersonal conflicts; or, number two, some issue with regards to promotion and career advancement; correct?" Dr. Hiatt replied, "It says that." "And what we see in here," Dr. Pinter-Brown continued, "has been what UCLA's playbook defensive mode has been in these lawsuits over the years; correct?" Dr. Hiatt replied, "I can't comment on lawsuits over the years."

Later in Dr. Hiatt's testimony, Dr. Pinter-Brown asked, "So, sir, the conclusions of that investigation – and this was an actual independent investigation report on acts of bias and discrimination involving faculty at the University of California Los Angeles. [¶] That was undertaken by [UCLA's] attorneys and retired Justice Carlos Moreno, among other people; correct?" Dr. Hiatt replied, "Back to the Moreno report?" to which Dr. Pinter-Brown replied, "Yes. The Moreno Report." Dr. Pinter-Brown stated, "[a]nd that Moreno Report highly criticized the written policies at [UCLA]; correct?" Dr. Hiatt replied, "Correct." "It said that they failed to define discriminatory conduct; correct?" Dr. Hiatt replied, "I would have to look at it in detail, but I accept your reading of it." Dr. Pinter-Brown continued, "[t]ake a look at page 16. There are eight bullet points there. After the words 'specifically, the review team concludes that,' and there [are] eight bullet points. [¶] Do you see that?" Dr. Hiatt replied that he did. "Okay. Second-to-last bullet point says '[UCLA]' " at which point UCLA objected to Dr. Pinter-Brown reading from the document. Dr. Pinter-Brown replied, "[i]t's cross-examination, your Honor." The court replied, "It is cross-examination, but the document has not been admitted into evidence." Dr. Pinter-Brown continued, "[t]his report criticized the investigations allegedly done by [UCLA] into complaints of discrimination, harassment, retaliation; correct?" Dr. Hiatt replied, "Correct." Dr. Pinter-Brown asked, "[t]his report criticized how [UCLA] swept under the rug complaints of discrimination, harassment, retaliation; correct? [¶] We can use the exact words to quote it, but that's what they're saying, in essence; correct?" Dr. Hiatt replied, "I agree with that."

53

Dr. Pinter-Brown asked, "[t]his report criticized [UCLA's] commitment to diversity in the workplace basically saying, yeah, you have these words and these policies at this great university, but you don't mean them, faculty; right, Dr. Hiatt?  And I'll try not to quote the report, but that's what they're saying to everybody."  Dr. Hiatt replied, "You know what?  That's a rebuke, and I accept the fact that the report was a stern rebuke."  Dr. Pinter Brown continued, "[a]nd that rebuke most significantly included sweeping under the rug real discrimination and harassment that occurred in the workplace; correct?"  UCLA objected as asked and answered; the court overruled the objection.  Dr. Hiatt replied, "I think that's correct."

Dr. Pinter-Brown then went on to paraphrase portions of the Moreno Report that she characterized as indicating UCLA was protective of doctors and professors who brought in large amounts of grant money and would look the other way if they were accused of harassment.  More than once during this line of questioning, Dr. Pinter-Brown emphasized that the Moreno report was authored by a retired Supreme Court justice.

On February 8, 2018, Dr. Pinter-Brown filed a motion asking the court to take judicial notice of the Moreno Report.  The court denied the motion, stating it was not going to take judicial notice of the report or allow it into evidence.  The court did say, however, it would "allow defendant to argue it, but . . . I think it's hearsay.  I think you certainly could have or might have been able to designate former Justice Moreno as an expert witness on this, but he wasn't and he is not here to testify.  I don't believe the report would be proper to admit into evidence, although I will indicate I am not sure it matters to either side.  There has been enough discussion as to what the general direction of the report

54

was, which is in evidence, and either side can argue it." UCLA then stated, "just for the record . . . the Moreno Report talks about or arises out of incidents of perceived bias, discrimination, intolerance at [UCLA] involving faculty of color, not gender." The court replied, "[w]e don't need to argue it. I am not allowing it into evidence."

On February 13, 2018, Dr. Pinter-Brown filed an amended trial brief seeking to admit the Moreno Report into evidence. She argued the report was admissible as an adoptive admission, an admissible party admission, an authorized admission, and for the non-hearsay purpose of "proving defendant's state of mind." The record before us does not provide the court's ruling on this request. Our review of the transcript does not reveal any oral argument or ruling on Dr. Pinter-Brown's attempt to put the Moreno Report before the jury via a trial brief, nor have the parties submitted any orders by the court ruling on the arguments raised in the trial brief. We also note that in her respondent's brief on appeal, Dr. Pinter Brown does not argue the Moreno Report is an exception to the hearsay rule because it could have been properly admitted as evidence of Dr. Hiatt's state of mind. We therefore treat as controlling the court's February 8, 2018 ruling declaring the Moreno Report inadmissible hearsay.

### B. DFEH Complaints

Before Dr. Hiatt's testimony, UCLA informed the court it anticipated Dr. Pinter-Brown would seek to introduce evidence of gender discrimination in UCLA's Neurology Department. UCLA argued it was an entirely different department, was not in the School of Medicine, was on a different campus, and operated under entirely different leadership than Dr. Pinter-Brown's department. UCLA asked the court to exclude this evidence. Dr.

55

Pinter-Brown stated she did wish to bring in this evidence. She stated Dr. Hiatt was quoted as saying publicly that this type of environment compromised research, teaching, and patient care. She argued this evidence was directly probative to her constructive termination because it showed how this working environment affected her. The trial court noted that "me too" evidence is admissible, but the issue was how far "me too" evidence extended. "I think that bringing in me too evidence, that is going on at, you know, U.C. Davis because it's still the Regents of the University, is too far afield in this case if we are talking about people who are in the medical department at [UCLA], even though it's a different facility." UCLA reiterated that the Neurology Department is not within the Department of Medicine. The court stated it would not bar the evidence but would entertain objections if UCLA believed it went too far afield.

On direct examination, Dr. Pinter-Brown asked Dr. Hiatt, "I presume you are concerned with gender discrimination that at times has raised its head at [UCLA] over the years, correct?" Dr. Hiatt replied, "I wouldn't necessarily concede [it has] raised its head at [UCLA] over the years, but I am absolutely concerned about it." Dr. Pinter-Brown replied, "Not only has it raised its head," at UCLA, "you have had approximately 50 some-odd department complaints against [UCLA] based on gender discrimination; isn't that true?" Dr. Hiatt replied, "I am not aware of those numbers."

Later in Dr. Hiatt's testimony, Dr. Pinter-Brown marked for identification a list of discrimination complaints filed with the DFEH against the University of California system as a whole. Dr. Pinter-Brown then asked, "[I]t shows that gender complaints had been rampant in particular with defendant?" UCLA objected

as argumentative, lack of foundation, and hearsay.  The court overruled the objection.  Dr. Pinter-Brown then asked, "You can see . . . 198 complaints filed" with the DFEH, "89 of them against defendant having to do with gender; right, sir?"  UCLA objected again and the court sustained the objection "as to counsel testifying."  The court then told Dr. Pinter-Brown she was welcome to ask Dr. Hiatt if the list refreshes his recollection "or other questions based upon it."

On cross-examination, UCLA asked Dr. Hiatt how many of the 198 charges identified in the DFEH disclosure involved the UCLA campus, to which Dr. Hiatt replied, "13."  UCLA elicited testimony from Dr. Hiatt that the list contained only four complaints involving gender, the list did not distinguish whether the complainant was faculty or staff, and the list did not indicate whether the complaints had any merit.

On redirect, Dr. Pinter-Brown asked Dr. Hiatt, "198 people came forward and said, 'I was discriminated, harassed and/or retaliated against' based upon various protected activities, correct?"  Dr. Hiatt replied, "I believe that is correct, yes."  Dr. Pinter-Brown than asked, "And there are 89 . . . that list out gender discrimination, harassment and/or retaliation?"  UCLA objected for lack of foundation and assuming facts not in evidence.  The court overruled the objection.  Dr. Pinter-Brown then moved to admit the entire list of DFEH complaints into evidence.  UCLA objected on "hearsay and also [Evidence Code section] 352" grounds.  The court replied, "There's been enough testimony about it from both sides.  I will allow it into evidence."

Dr. Pinter-Brown went on to challenge Dr. Hiatt in eight pages of the transcript as to how Dr. Hiatt concluded there were only four complaints of gender harassment at UCLA, prodding

him to admit that there were a total of 89 complaints against the entire University of California system based on selected portions of the exhibit. On re-cross, UCLA had Dr. Hiatt clarify that only 13 complaints took place in Los Angeles and, of those 13, only four involved gender.

>    C.    *It Was Error for the Court to Permit the Jury to Hear Evidence of The Moreno Report and DFEH Complaints*

On appeal, Dr. Pinter-Brown argues UCLA did not properly object to the testimony about the Moreno Report and that the Moreno Report did in fact address gender discrimination. She also argues UCLA "opened the door" to the admission of the DFEH complaints. We disagree.

As for the contention UCLA did not sufficiently object to the admission of testimony about the Moreno Report, we have listed above the multiple objections UCLA lodged. Furthermore, UCLA filed a motion in limine to exclude evidence of mistreatment by other employees at UCLA. The court denied the motion. Generally, once a motion in limine is denied, no more is needed to preserve the record on appeal. (*People v. Morris* (1991) 53 Cal.3d 152, 190, disapproved of on other grounds in *People v. Stansbury* (1995) 9 Cal.4th 824, 830 fn. 1.) Accordingly, we find UCLA properly preserved the issue on appeal.

Additionally, Dr. Pinter-Brown's contention the Moreno Report addressed gender discrimination at UCLA does not alter our analysis. She cites to four sentences within a 25-page report that briefly mention incidents of gender discrimination but which are not included in the ultimate analysis and findings.

58

Finally, at oral argument, Dr. Pinter-Brown argued she used the Moreno Report not for the truth of the matter asserted or as propensity evidence, but for the non-hearsay purpose of proving Dr. Hiatt's state of mind. She argued she submitted a motion specifically asking the court to allow the Moreno Report into evidence to prove Dr. Hiatt's state of mind. We presume she is referring to the February 13, 2018 trial brief she submitted, in which she argued in part that the Moreno Report be admitted to show the defendant's state of mind. Yet, as indicated above, she provides us with no record that the court ever ruled on the issue.

Furthermore, Dr. Pinter-Brown did not sufficiently raise this argument in her respondent's brief. She referenced her request to have the Moreno Report admitted only in a brief footnote, in which she complains UCLA excluded from its appendix the trial brief "regarding the Report's admissibility as an authorized admission," *not* as evidence of the defendant's state of mind. Dr. Pinter-Brown provided no legal argument or authority in her brief addressing whether the Moreno Report was admissible to prove Dr. Hiatt's state of mind. Nor did she furnish us with a record or a citation to the record indicating whether or how the court ruled on her request to admit the Moreno Report as non-hearsay evidence to prove Dr. Hiatt's state of mind. As stated above, the court's ruling that the Moreno Report was inadmissible hearsay is therefore controlling on this issue.

In any event, Dr. Pinter-Brown cannot raise this issue for the first time at oral argument. In their briefing, parties to an appeal must support their points with argument, case authority, and citations to the record. (Cal. Rules of Court, rule 8.204(a)(1)(B) & (C).) When legal argument is not supported by citation to legal authority on a particular point, "we may treat the

point as forfeited and pass it without consideration." (*Allen v. City of Sacramento* (2015) 234 Cal.App.4th 41, 52.) And, when a party does not tell us if or how the court ruled on an issue, the party has forfeited appellate consideration of the issue. (*Atempa v. Pedrazzani* (2018) 27 Cal.App.5th 809, 831.) Dr. Pinter-Brown has therefore forfeited review of her assertion that the contents of the Moreno Report were admissible to prove Dr. Hiatt's state of mind.

UCLA did not open the door to the DFEH complaints. As discussed above, *Dr. Pinter-Brown* initiated the subject by marking the list of DFEH complaints for identification and then asking Dr. Hiatt if he was familiar with any of the complaints. After the jury learned about the 198 DFEH complaints, it was entirely appropriate for UCLA to use the list to clarify that only four of those complaints involved gender discrimination at UCLA.

In any event, the reports should not have been admitted.

"[E]vidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion." (Evid. Code, § 1101, subd. (a). Evidence of a crime, civil wrong, or other act is not prohibited, however, when relevant to prove some other fact such as motive, intent, knowledge, absent of mistake, and the like. (*Id.*, subd. (b).)

Courts have sanctioned the use of "me too" evidence, which is evidence of an employer's alleged gender bias "in the form of harassing activity against women employees other than the plaintiff" in certain circumstances. (*Pantoja v. Anton* (2011) 198 Cal.App.4th 87, 92 (*Pantoja*).) Where evidence of workplace discrimination is proffered to cast doubt on an employer's stated

60

justification for an adverse employment action, for example, "me too" evidence can be admissible to show intent or motive, which could establish that the employer's stated reason was a pretext. (*Johnson v. United Cerebral Palsy/Spastic Children's Foundation (Johnson)* (2009) 173 Cal.App.4th 740, 760.)  The "me-too" doctrine, however, does not permit a plaintiff to present evidence of discrimination against employees outside of the plaintiff's protected class to show discrimination or harassment against the plaintiff.  (*Hatai v. Department of Transportation* (2013) 214 Cal.App.4th 1287, 1297–1298, disapproved of on other grounds in *Williams v. Chino Valley Independent Fire District* (2015) 61 Cal.4th 97, 115.)  Although "me too" evidence can be admissible to prove intent, motive, and the like with respect to the plaintiff's own protected class, it is never admissible to prove an employer's propensity to harass.  (*Pantoja,* at p. 111.)

In other words, Dr. Pinter-Brown told the jury that because the entire UCLA campus – not just the medical school – failed to protect racial and ethnic minorities from discrimination, the UCLA medical school failed to protect Dr. Pinter-Brown from gender discrimination.  The Moreno Report served only to convince the jury that the Medical School had a propensity to harass, and Dr. Pinter-Brown used it explicitly to tell the jury that they did the exact same thing to her.

There is no question the court allowed Dr. Pinter-Brown to use the Moreno Report to paint UCLA as a hotbed of discrimination and harassment.  During closing argument, Dr. Pinter-Brown quoted "[e]xactly what Justice Carlos Moreno stated in his 34-page conclusions . . . : 'We don't investigate.  We don't educate.  We don't take seriously antidiscrimination laws here.  And in fact, when we are dealing with a professor or

someone who brings a lot of money into [UCLA], we, as a practice, sweep it under the rug.' That is what that independent investigation into discrimination, bias and retaliation at [UCLA] concluded." Dr. Pinter-Brown described the Moreno Report as "the very blueprint[] of what goes on and what has gone on by a neutral, as it's phrased, an independent investigation." Dr. Pinter-Brown described the report as "condemning how they operate with regard to this particular issue."

Toward the end of closing argument, Dr. Pinter-Brown argued, "The Moreno Report – and you don't have that in evidence, but you have testimony about it specifically – in other words, the document will not be in the jury room, but you have testimony from a few witnesses, including Dr. Hiatt, about it. [¶] And what that report concluded was that a major problem we have here is when there is actual discrimination going on, it gets just whitewashed as an interpersonal conflict. There is no investigation – real investigation. H.R. is not involved. Shocking. Title IX doesn't get involved. Shocking. Same thing we had here. And we just call it an 'interpersonal conflict' and sweep it under the rug. That is exactly what the report concluded and that is exactly what defendants in their play book [have] tried to portray what this case is about."

The trial court would not admit the Moreno Report because it was hearsay. This, however, was wholly insufficient because Dr. Pinter-Brown was able to coax the content and conclusions of the Moreno Report out of multiple witnesses. Secondary evidence of a document that is hearsay is "no more admissible" than the document itself, "which is to say, not at all." (*Pajaro Valley Water Management Agency v. McGrath* (2005) 128 Cal.App.4th 1093, 1108.) The court abandoned its duty to ensure UCLA

62

received a fair and impartial trial when it allowed the contents of the irrelevant and highly prejudicial Moreno Report—which dealt with discrimination outside of Dr. Pinter-Brown's protected class—to come in through a series of leading questions by her attorney and the answers thereto.

With respect to the DFEH complaints, the question the court must consider in deciding whether to admit evidence of discrimination raised by other employees is " 'fact based and depends on many factors, including how closely related the evidence is to the plaintiff's circumstances and theory of the case.' " (*Johnson, supra,* 173 Cal.App.4th at p. 767, citing *Sprint/United Management Co. v. Mendelsohn* (2008) 552 U.S. 379, 387.) In *Johnson*, for example, the plaintiff claimed she was wrongly terminated for being pregnant. (*Johnson,* at p. 744.) The appellate court held the trial court should have admitted declarations of four employees who worked at the same office and under the same three supervisors as the plaintiff, and who also alleged they were fired for being pregnant.. (*Id.* at pp. 767–768.)

Unlike *Johnson*, there is no evidence whatsoever about who the alleged victims were in the list of DFEH complaints, whether they complained to the medical school, whether the complaints had merit, whether complainants were supervised or even had any contact with Dr. Hiatt, Dr. Glaspy, Dr. de Vos, Dr. Slamon, or any of the other actors Dr. Pinter-Brown claimed had wronged her. There was simply no evidence establishing the relationship between these anonymous complaints and Dr. Pinter-Brown's circumstances or the theory of her case. The only purpose those complaints served was to, again, paint UCLA as rife with unchecked gender discrimination.

"[Eighty-nine] governmental charges of gender discrimination against the defendant here in the last five years, since 2012 to 2017," Dr. Pinter-Brown told the jury during closing argument. "[Fifty] of them at [UCLA] in particular." Later, she argued, "[t]hese people here . . . these are women who worked for the Regents and experienced, from their perception, gender discrimination . . . so on and so on and so on, sex, gender. These aren't just a statistic to say, 'you are messing up, [UCLA].' These are people whose lives have been affected, from their perception at least. [¶] These are women not trying to manipulate any system, as defense counsel has pointed to my client so many times in this trial, trying to paint her to be some manipulative whatever. These are people who just want to work in a fair environment that wasn't presented to them, and who obviously didn't get [redress] or any remedy within [UCLA] because now they have gone to the state government and complained. That is what this is about. [¶] . . . These are women alleging gender discrimination to the state government saying who they represent is not fair to women."

The jury had no information about the factual scenarios underlying the DFEH complaints submitted to the jury. Nor did they have any information about which departments employed the complainants or who their supervisors were. This "me too" evidence, therefore, was far from the type contemplated in *Johnson* and *Pantoja*, as Dr. Pinter-Brown proffered no evidence that the DFEH complaints " 'set[] out factual scenarios related by former employees of defendant that [were] sufficiently similar" to the one Dr. Pinter-Brown presented. (*Pantoja*, *supra*, 198 Cal.App.4th at p. 114, quoting *Johnson, supra,* 173 Cal.App.4th at p. 767.) Instead, the court allowed Dr. Pinter-

Brown to use this laundry list of anonymous, undefined allegations of discrimination at UCLA to convince the jury Dr. Pinter-Brown's own complaints were legitimate. This is nothing more than run of the mill propensity evidence, which should have never been presented to the jury.

## III.    Retaliation Cause of Action

As discussed above, the trial court allowed Dr. Pinter-Brown to place a cause of action for retaliation before the jury even though the claim had been adjudicated against her before trial. This was an inexplicable error.

Summary adjudication of a cause of action "is a judicial determination that the issue is not subject to further controversy." (*Abadjian v. Superior Court* (1985) 168 Cal.App.3d 363, 370.) Summary adjudication of an issue is binding. (*Ibid.*). Following a grant of summary adjudication in a defendant's favor, the cause of action is deemed "established" and the parties may not relitigate the issue. (*Raghavan v. Boeing Co.* (2005) 133 Cal.App.4th 1120, 1136; *St. Paul Mercury Ins. Co. v. Frontier Pacific Ins. Co.* (2003) 111 Cal.App.4th 1234, 1249.)

Dr. Pinter-Brown argues California liberally allows amendments to the pleadings to conform to proof at trial. While this is true, that it is not at all what happened here. The "amended" cause of action was nothing more than the original retaliation complaint with the phrase "Retaliation for *Complaining* of Gender Discrimination and/or Harassment" changed to "Retaliation for *Opposing* Gender Discrimination and/or Harassment." (Italics added.) It was not a request for amendment according to proof, it was plainly an attempt to get a second bite of the apple.

As summarized by our Supreme Court, amendments according to proof " 'have been allowed with great liberality "and no abuse of discretion is shown *unless by permitting the amendment new and substantially different issues are introduced in the case or the rights of the adverse party prejudiced."* ' " (*Garcia v. Roberts* (2009) 173 Cal.App.4th 900, 909, quoting *Trafton v. Youngblood* (1968) 69 Cal.2d 17, 31.) Amendments of pleadings to conform to proof should not be allowed, however, " ' "when they raise new issues not included in the original pleadings and *upon which the adverse party had no opportunity to defend."* ' " (*Ibid.,* italics added.)

The court did not state its reasoning for allowing the retaliation claim to come in at the conclusion of evidence, and we cannot surmise why it would force UCLA to defend against a cause of action it disposed of before trial. The court merely stated reviving the claim would be harmless. We disagree.

The purpose of summary adjudication is to "dispose of one or more issues before trial so that the parties may focus on the questions remaining." (*Conway v. Bughouse, Inc.* (1980) 105 Cal.App.3d 194, 202.) When the trial court adjudicated the retaliation claim, the judgment as to that issue was final and could not be revived. We can imagine few things more prejudicial to UCLA than to have that judgment nullified at the close of evidence, forcing UCLA to argue an issue it could not have reasonably been expected to defend.

Additionally, retaliation is an egregious offense. It is entirely separate from the issue of whether there was indeed discrimination and is proven by different acts and events. It necessarily implies UCLA sought revenge against Dr. Pinter-Brown when she complained. To subject an employee to

66

disparate treatment on account of gender is one thing. To punish her for standing up for herself is quite another – it requires a certain amount of calculated hostility that a jury could easily find worthy of very harsh punishment.

The court had already adjudicated the retaliation issue. To put it before the jury at the eleventh hour constituted an ambush. Dr. Pinter-Brown took advantage of this ambush when, on rebuttal, she argued to the jury: "There is no reference by the defense, one iota, about retaliation claims specifically because with the retaliation claim, Dr. Pinter-Brown, she doesn't have to prove that discrimination actually occurred. She doesn't have to prove that harassment actually occurred. She just has to prove that she reasonably believed that is what was going on and that she complained about it and that she was retaliated by it." (*Sic.*)

It was contrary to law and manifestly unfair to UCLA to allow Dr. Pinter-Brown to argue retaliation to the jury after the issue was summarily adjudicated, and then to imply UCLA's failure to defend against the retaliation claim during oral argument was itself evidence of retaliation.

## IV. UCLA Was Prejudiced by the Cumulative Errors

"Where mistakes on the part of the trial court abound and touch not only the charge to the jury but also rulings on evidence, it cannot be assumed that defendant has had a fair trial and that no miscarriage of justice has resulted." (*People v. McGee* (1947) 31 Cal.2d 229, 245 (dis. opn. of Carter, J.).)

The errors in this case were cumulative: (1) the court's charge to the jury that they stand in the shoes of Dr. King and bend the arc of the moral universe toward a future free of discrimination; (2) allowing the contents and conclusions of a report documenting racial discrimination at UCLA, authored by a

retired Supreme Court justice, to be used as propensity evidence to show UCLA's Medical School discriminated against Dr. Pinter-Brown on the basis of gender; (3) allowing the jury to view and hear testimony about a long list of anonymous unadjudicated discrimination complaints not properly connected to Dr. Pinter-Brown's particular circumstances or her theory of the case; and (4) resurrecting after the close of evidence a retaliation claim previously adjudicated against Dr. Pinter-Brown.

We conclude this was a reasonably close case. The evidence suggested Dr. Pinter-Brown was treated poorly by Dr. de Vos and her supervisors at UCLA. The timing of the audits after five years of problem-free clinical research could create suspicions about UCLA's motives and intent. The immediate reaction that this was just a personality clash between her and her colleagues is a common employer theme. Additionally, Dr. Glaspy and Dr. Slamon, Dr. Pinter-Brown's immediate supervisors, could have done more to help her and to take her genuine distress more seriously.

On the other hand, there was ample evidence there were legitimate reasons for the audits; Dr. Pinter-Brown did not sufficiently respond to the audit reports; she received the support she needed to regain her privileges as a principal researcher without a loss in pay; and she herself did not feel the harassing and dismissive actions of her colleagues were gender-based.

Based on the totality of the circumstances, we cannot conclude the cumulative errors identified here were harmless. (See *Piscitelli v. Friedenberg* (2001) 87 Cal.App.4th 953, 976.) Because the evidence was closely balanced, with two jurors finding in favor of UCLA, we believe it is reasonably probable a result more favorable to UCLA would have been reached in the

absence of these errors.  (See *Menchaca v. Helms Bakeries, Inc.* (1968) 68 Cal.2d 535, 545.)

The court's errors constituted a miscarriage of justice and created an atmosphere in which UCLA did not receive a fair trial. Accordingly, we reverse the judgment.

## DISPOSITION

The judgment is reversed.  Costs are awarded to Appellant Regents of the University of California.

## CERTIFIED FOR PUBLICATION

STRATTON, J.

We concur:

GRIMES, Acting P. J.

WILEY, J.

# Appendix A

CASE NUMBER:          BC624838

CASE NAME:            PINTER-BROWN VS U.C. REGENTS

LOS ANGELES, CALIFORNIA:  MONDAY, JANUARY 29, 2018

DEPARTMENT 34:        HON. MICHAEL LINFIELD, JUDGE

APPEARANCES:          (SEE APPEARANCE PAGE)

REPORTER:             DREENA TABOR, CSR NO. 5504

TIME:                 10:05 A.M.


                    --O0O--


        (THE FOLLOWING PROCEEDINGS WERE HELD IN OPEN

        COURT IN THE PRESENCE OF THE PROSPECTIVE JURY:)


        THE COURT:  THE ARC OF THE MORAL UNIVERSE IS
LONG.  DR. MARTIN LUTHER KING SAID THESE WORDS IN 1965.
THE ARC OF THE MORAL UNIVERSE IS LONG, BUT IT BENDS
TOWARD JUSTICE.

        IT'S MY PLEASURE TO WELCOME YOU HERE TO
THE SUPERIOR COURT TO DEPARTMENT 34.  IF YOU ARE
SELECTED AS A JUROR IN THIS CASE, YOUR JOB WILL BE TO
HELP BEND THAT ARC TOWARD JUSTICE.

        NOW, WE ALL REMEMBER -- SOME OF THOSE OF
YOU WHO ARE MY GENERATION REMEMBER DIRECTLY, OTHERS HAVE
READ IT IN THEIR HISTORY BOOKS, 1963, DR. KING STOOD ON
THE STEPS OF THE LINCOLN MEMORIAL, HE GAVE HIS FAMOUS "I
HAVE A DREAM" SPEECH.

        IN THERE, HE SPOKE OF HIS DREAM THAT
SOMEDAY WE WOULD LIVE IN A SOCIETY WHERE PEOPLE WERE

JUDGED BY THE CONTENT OF THEIR CHARACTER AND NOT BY THE COLOR OF THEIR SKINS. DURING THAT SPEECH -- IT'S NOT AS WELL REMEMBERED -- BUT HE ALSO QUOTED THE OLD TESTAMENT PROPHET AMOS.

(VIDEO PLAYING.)

THE COURT: BUT YOU KNOW AND I KNOW JUSTICE DOESN'T ROLL DOWN LIKE WATER. GRAVITY DOESN'T BRING JUSTICE. PEOPLE BRING JUSTICE. EVERY DAY, PEOPLE STAND UP IN COURT, PLAINTIFFS AND DEFENDANTS ALIKE, AND THEY STAND UP FOR JUSTICE. THEY STAND UP FOR THEMSELVES, FOR THEIR FAMILY, FOR THEIR SCHOOLS, FOR THEIR CAMPUSES, FOR THEIR COMMUNITIES, FOR THEIR COMPANIES. EVERY DAY, PLAINTIFFS AND DEFENDANTS STAND UP AND COME TO COURT STANDING UP FOR JUSTICE. AND IT WILL BE YOUR JOB AS JURORS IN THIS CASE TO DETERMINE WHAT IS JUSTICE UNDER THE LAWS OF OUR STATE.

NOW, AFTER -- TWO YEARS AFTER DR. KING GAVE HIS FAMOUS "I HAVE A DREAM" SPEECH, THINGS HADN'T CHANGED MUCH. THERE WAS STILL SEGREGATION. PEOPLE WERE BEING DENIED THE RIGHT TO VOTE. DR. KING ORGANIZED A MAJOR MARCH IN SELMA TO MONTGOMERY, ALABAMA. IT WAS A SEVEN-DAY MARCH.

AT FIRST, HUNDREDS AND THOUSANDS AND ULTIMATELY TENS OF THOUSANDS OF PEOPLE JOINED THE MARCH TO DEMONSTRATE FOR EQUAL RIGHTS AND FOR FAIR TREATMENT FOR AFRICAN-AMERICANS AND POOR PEOPLE THROUGHOUT THE

COUNTRY.

AS DR. KING MARCHED, THEY ARRIVED IN SELMA, ALABAMA -- I'M SORRY, MONTGOMERY, ALABAMA, AT THE END OF THE SPRING OF 1965, AND DR. KING EXHORTED HIS LISTENERS NOT TO GIVE UP HOPE, BECAUSE IN HIS WORDS, "EVEN THOUGH THE ARC OF MORAL JUSTICE IS LONG, IT DOES BEND TOWARD JUSTICE."

(VIDEO PLAYING.)

THE COURT: I WANT TO FOLLOW WITH YOU JUST FOR A FEW MOMENTS THAT ARC OF JUSTICE THROUGH AMERICAN HISTORY. TEN YEARS BEFORE DR. KING ARRIVED IN MONTGOMERY, ROSA PARKS REFUSED TO GIVE UP HER SEAT ON THE FRONT OF THE BUS.

THE BUSES IN MONTGOMERY, ALABAMA IN THE '50S WERE SEGREGATED. WHITES SAT IN THE FRONT, BLACKS SAT IN THE BACK OF THE BUS. ROSA PARKS CAME HOME FROM WORK ON DECEMBER 1ST, 1955. SHE SAT IN THE FRONT OF THE BUS. THE WHITE BUS CONDUCTOR TOLD HER TO GIVE UP HER SEAT FOR A WHITE MAN AND SHE REFUSED. SHE WAS ARRESTED, FINGERPRINTED, TRIED, CONVICTED OF VIOLATING THE MONTGOMERY CITY STATUTES.

IT WAS INTERESTING HOW THE COMMUNITY RESPONDED. THEY RESPONDED IN TWO WAYS. FIRST THEY ORGANIZED A BOYCOTT. PEOPLE REFUSED TO RIDE THE BUS IN SUPPORT OF ROSA PARKS. PEOPLE WALKED TO WORK. THEY WALKED TO SCHOOL. THEY WALKED TO THE GROCERY STORE.

THEY WALKED TO THEIR CHURCHES.

AND AT THE SAME TIME, ROSA PARKS' ATTORNEYS FILED A LAWSUIT THAT 13 MONTHS LATER MADE ITS WAY TO THE SUPREME COURT AND THE SUPREME COURT HELD THAT SEGREGATION ON THE BUSES WAS ILLEGAL AND THE BUSES IN MONTGOMERY WERE DESEGREGATED.

BUT THAT ARC GOES BACK EVEN FURTHER. ONE HUNDRED YEARS BEFORE ROSA PARKS IN 1854, A YOUNG WOMAN NAMED ELIZABETH JENNINGS GOT ON A HORSE-DRAWN TROLLEY CAR IN NEW YORK CITY. OF COURSE, THERE AREN'T ANY BUSES, THIS IS BEFORE THE TIME OF BUSES, BUT THERE WERE HORSE-DRAWN TROLLEY CARS.

SHE GOT ON A TROLLEY CAR GOING DOWN TO HER CHURCH ONE SUNDAY MORNING. THE DRIVER OF THE TROLLEY CAR TOLD HER TO GET OFF AND WAIT FOR THE NEXT TROLLEY CAR THAT WOULD BE COMING IN A COUPLE MINUTES THAT HAD A SIGN ON IT FOR COLORED PEOPLE. SHE REFUSED TO GET OFF. THE CONDUCTOR CALLED THE POLICE. THE POLICE DRAGGED HER OFF BY HER FEET. THIS IS NOW 1854, SEVEN YEARS BEFORE THE CIVIL WAR.

ELIZABETH JENNINGS, WHAT DOES SHE DO? SHE HIRED AN ATTORNEY. SHE HIRED A YOUNG ATTORNEY NAMED CHESTER ARTHUR. HE HAD JUST PASSED THE BAR. THIS WAS HIS FIRST CASE AND HE TOOK THE CASE TO AN ALL-WHITE, ALL-MALE JURY IN BROOKLYN, NEW YORK, AND THEY FOUND FOR ELIZABETH JENNINGS, THEY FOUND THAT THE TROLLEY CAR COMPANY HAD MISTREATED HER.

THEY AWARDED JENNINGS -- WHO HAPPENED TO

HAVE BEEN A SCHOOL TEACHER IN THE NEW YORK PUBLIC SCHOOL SYSTEM -- THEY AWARDED ONE YEAR'S SALARY, $255. A WEEK LATER, THE TROLLEY CAR COMPANIES IN NEW YORK DESEGREGATED BEFORE THE CIVIL WAR.

INTERESTINGLY, 27 YEARS LATER, CHESTER ARTHUR, HER YOUNG ATTORNEY, BECAME PRESIDENT OF THE UNITED STATES. THAT ARC IS LONG, IT DOES BEND TOWARD JUSTICE.

AND IT GOES BACK EVEN FURTHER. IT GOES BACK TO THE TIME OF OUR FOUNDING FATHERS. WHEN OUR FOUNDING FATHERS WROTE THE CONSTITUTION, THEY HAD MANY THINGS ON THEIR MIND THAT THEY WANTED FOR OUR NEW NATION, BUT FIRST AND FOREMOST, THEY WANTED TO ESTABLISH JUSTICE.

AND WE KNOW THAT BECAUSE THE PREAMBLE TO THE CONSTITUTION SAYS, "WE THE PEOPLE OF THE UNITED STATES, IN ORDER TO FORM A MORE PERFECT UNION, ESTABLISH JUSTICE, ENSURE DOMESTIC TRANQUILITY, PROVIDE FOR THE COMMON DEFENSE, PROMOTE THE GENERAL WELFARE AND SECURE THE BLESSINGS OF LIBERTY TO OURSELVES AND OUR POSTERITY, DO ORDAIN AND ESTABLISH THIS CONSTITUTION FOR THE UNITED STATES OF AMERICA."

NOW, I SPOKE OF OUR FOREFATHERS. I USE THAT TERM CORRECTLY. THE PEOPLE WHO WROTE OUR CONSTITUTION WERE ALL MEN. IF YOU WANTED TO WRITE A CONSTITUTION, IF YOU WANTED TO PARTICIPATE IN POLITICAL LIFE IN 1790S, IF YOU WANTED TO VOTE, YOU HAD TO BE A MAN. YOU HAD TO BE A WHITE MAN. YOU HAD TO BE A RICH,



PROPERTY-OWNING WHITE MAN. BUT THAT ARC HAS BENT TOWARD JUSTICE SINCE THEN.

AFTER THE CIVIL WAR, WE PASSED THE 15TH AMENDMENT GIVING FORMER SLAVES THE RIGHT TO VOTE, BUT STILL WOMEN COULDN'T VOTE. IN 1872, SUSAN B. ANTHONY, THE HEAD OF THE WOMEN'S SUFFRAGE MOVEMENT, VOTED IN THE NATIONAL ELECTIONS. SHE VOTED FOR ULYSSES S. GRANT. SHE CONFIDED TO A FRIEND SHE VOTED THE STRAIGHT REPUBLICAN PARTY TICKET.

WHAT WAS HER REWARD? SHE WAS ARRESTED. IT WAS ILLEGAL FOR WOMEN TO VOTE. SHE WAS TRIED IN UPSTATE NEW YORK. THE JUDGE DID NOT ALLOW HER TO TESTIFY ON HER OWN BEHALF. SHE WAS NOT, SURPRISINGLY, CONVICTED. SHE IS FINED $100. SO SHE STOOD UP IN COURT AND SAID SHE WOULD NEVER PAY A PENNY OF THAT UNJUST FINE, AND SHE DIED 25 YEARS LATER. SHE STILL HADN'T PAID THE FINE, BUT WOMEN STILL DIDN'T HAVE THE RIGHT TO VOTE.

IN FACT, 1918, JUST A HUNDRED YEARS AGO, THE FIRST WOMAN WAS ELECTED TO CONGRESS. JEANNETTE RANKIN, A WOMAN FROM MONTANA, WAS ELECTED TO CONGRESS, FIRST WOMAN EVER ELECTED, BUT WOMEN STILL COULDN'T VOTE. IT TOOK ANOTHER TWO YEARS.

THE FIRST DEMONSTRATION WAS IN FRONT OF THE WHITE HOUSE. FIRST TIME ANYONE EVER DEMONSTRATED WAS FOR THE WOMEN'S RIGHT TO VOTE. AND FINALLY, 1920, THE NEXT YEAR, CONGRESS PASSED THE 19TH AMENDMENT. IT WAS RATIFIED BY THE STATES AND WOMEN GAINED THE RIGHT TO

VOTE. THAT ARC IS LONG, IT DOES BEND TOWARDS JUSTICE.

JUMPING AHEAD ANOTHER GENERATION, IN THE 1940S WE ARE IN THE MIDDLE OF WORLD WAR II AGAINST THE GERMAN NAZIS, THE ITALIAN FASCISTS, THE ROYAL JAPANESE ARMY. THE UNITED STATES ISSUED A PROCLAMATION REGARDING ALL JAPANESE-AMERICANS HERE IN ON THE WEST COAST, 120,000 JAPANESE-AMERICANS TO PICK UP THEIR BELONGINGS AND TO BE INTERNED, BASICALLY BE IN PRISON FOR THE REST OF THE WAR.

PEOPLE WHO HAD LIVED HERE THEIR WHOLE LIFE -- THEIR PARENTS, GRANDPARENTS -- MANY WERE AMERICAN CITIZENS. THEY WERE GIVEN 48 HOURS TO TAKE WHATEVER THEY COULD TAKE IN THEIR SUITCASES AND THEY WERE INTERNED IN RELOCATION CAMPS, IN PRISON FOR THE WAR, THE REST OF THE WAR, BECAUSE THEY WERE DEEMED TO BE DANGEROUS.

NOW, IT WAS INTERESTING. OF COURSE, WE ARE FIGHTING THE GERMANS AND ITALIANS, BUT WE NEVER REQUIRED GERMAN-AMERICANS TO BE INTERNED. WE NEVER REQUIRED ITALIAN-AMERICANS TO BE INTERNED. ONLY THE JAPANESE-AMERICANS.

AND ONE MAN, FRED KOREMATSU, AN AMERICAN CITIZEN, SUED. HE SAID IT WAS CLEARLY A VIOLATION OF HIS RIGHT AS AN AMERICAN CITIZEN TO BE IN PRISON FOR BEING NOTHING MORE THAN OF JAPANESE HERITAGE.

HIS CASE MADE ITS WAY TO THE SUPREME COURT IN 1944. THEY RULED ON THE KOREMATSU CASE. UNFORTUNATELY, WE WERE STILL IN THE MIDST OF WORLD WAR

II. WE WERE STILL IN WARTIME, HYSTERIA AND RACISM, AND THE SUPREME COURT UPHELD HIS CONVICTION AND INTERNMENT OF THE JAPANESE-AMERICANS.

BUT THE CASE ULTIMATELY WENT BACK TO THE COURTS 20 YEARS LATER AND IN THE 1970S, THE CASE WENT BACK TO THE COURTS AND THE COURTS REVERSED THEMSELVES, AND THEY RULED WHAT HAD HAPPENED TO MR. KOREMATSU AND THE OTHER 110,000 JAPANESE-AMERICANS WAS A VIOLATION OF THE CONSTITUTION.

THE CONGRESS PASSED A LAW GIVING SOME REPARATIONS TO THE JAPANESE-AMERICANS WHO WERE INTERNED. PRESIDENT REAGAN SIGNED A PROCLAMATION APOLOGIZING FOR THE INTERNMENT. THAT ARC IS LONG, IT DOES BEND TOWARD JUSTICE.

IT STARTED IN 1965 WITH DR. KING'S MARCH FROM SELMA TO MONTGOMERY. THAT SAME YEAR HERE IN CALIFORNIA, PEOPLE LIKE DOLORES HUERTA AND CESAR CHAVEZ STARTED A PILGRIMAGE FROM DELANO TO SACRAMENTO, 254 MILES, TO BRING ATTENTION TO THE PLIGHT OF THE POOREST OF THE POOR HERE IN CALIFORNIA, THE MEXICAN-AMERICAN AND FILIPINO-AMERICAN FARM WORKERS WHO WERE BEING DENIED THEIR BASIC RIGHTS UNDER THE LAW.

AND DOLORES HUERTA AND CESAR CHAVEZ APPEARED IN COURTS, IN THIS COURT -- ALSO IN THIS COURT, DIRECTLY IN THIS COURT MANY TIMES. SOMETIMES THEY APPEARED AS THE PLAINTIFFS, SOMETIMES THEY APPEARED AS DEFENDANTS, EACH TIME SEEKING JUSTICE FOR PEOPLE JUST LIKE YOU SITTING HERE ON A JURY.

I PROBABLY WOULD BE REMISS IF I DIDN'T END THIS BRIEF TALK WITH A LOOK AT THE FIRST OPENLY GAY PERSON EVER ELECTED AS A PUBLIC OFFICIAL IN THE UNITED STATES.  HARVEY MILK IN 1977 WAS ELECTED AS A SUPERVISOR IN SAN FRANCISCO.  HE IS AN OPENLY GAY MAN.

ELEVEN MONTHS AFTER HIS ELECTION, HE WAS ASSASSINATED BY ANOTHER SUPERVISOR ON THE BOARD OF SAN FRANCISCO BOARD OF SUPERVISORS.  HE DIDN'T GET TO SEE THAT JUST TWO YEARS AGO, NOW TWO AND A HALF YEARS AGO, OUR SUPREME COURT RULED THAT DISCRIMINATION AGAINST GAYS AND LESBIANS WAS UNCONSTITUTIONAL, THAT GAYS AND LESBIANS, LIKE EVERYONE ELSE, HAD THE RIGHT TO MARRY AND RAISE A FAMILY.

THAT ARC DOES BEND.  SOMETIMES IT BENDS TOWARD JUSTICE WHEN THE COURT RULES FOR THE PLAINTIFF.  SOMETIMES IT BENDS TOWARD JUSTICE WHEN THE COURT RULES FOR THE DEFENDANT.

NOW, AS AN 11-YEAR-OLD, I HAD THE HONOR OF STANDING BEFORE DR. KING, STANDING WITH DR. KING, AND I WAS HONORED BECAUSE, OF COURSE, HE WAS HELPING TO BEND THAT ARC.

TODAY AS A SUPERIOR COURT JUDGE, I AM HONORED TO SIT BEFORE ALL OF YOU BECAUSE TODAY, YOU ARE THE PEOPLE WHO ARE GOING TO BE BENDING THAT ARC.

NOW, WHY DO I TALK TO YOU ABOUT DR. KING AND BENDING THE ARC?  IS THE PLAINTIFF IN THIS CASE A DR. KING OR A ROSA PARKS OR ELIZABETH JENNINGS?  NO.  IS THE DEFENDANT IN THIS CASE A DR. KING OR SUSAN B.

ANTHONY OR CESAR CHAVEZ? NO. BUT YOU AS JURORS IN THIS CASE ARE GOING TO BECOME DR. KING. IT'S GOING TO BE YOUR JOB TO HELP BEND THAT ARC TOWARD JUSTICE BY RENDERING A VERDICT BASED ON THE LAW AND THE EVIDENCE THAT YOU ARE GOING TO BE HEARING IN THIS CASE.

NOW, WHEN I WAS IN JUNIOR HIGH SCHOOL, ABOUT THE TIME THAT PHOTOGRAPH WAS TAKEN OF MYSELF AND DR. KING, I READ A BOOK BY HARPER LEE. MANY OF YOU PROBABLY READ IT, TO KILL A MOCKINGBIRD.

IT'S THE STORY OF A SMALL FAMILY IN THE SOUTH, THE DEPRESSION ERA SOUTH IN 1930S, THAT THE HEAD OF THE FAMILY, ATTICUS FINCH, IS A SMALL-TIME LAWYER AND HE IS APPOINTED TO REPRESENT THE BLACK SHARECROPPER, TOM ROBINSON, WHO IS ACCUSED UNJUSTLY OF RAPING A WHITE WOMAN.

THE MOVIE -- GREGORY PECK PLAYS ATTICUS FINCH, AND IN THE MOVIE, ATTICUS FINCH STANDS UP IN FRONT OF THE JURY AND IN HIS SUMMATION, HE TELLS THE JURY THE FOLLOWING:

(VIDEO PLAYING)

THE COURT: THEN HE GOES ON TO SAY, "LADIES AND GENTLEMEN, A COURT IS NO BETTER THAN EACH ONE OF YOU SITTING BEFORE ME HERE ON THIS JURY. A COURT IS ONLY AS SOUND AS ITS JURY, AND A JURY IS ONLY AS SOUND AS THE MEN AND WOMEN WHO MAKE IT UP." TODAY, YOU WILL BE THE MEN AND WOMEN WHO WILL MAKE UP OUR JURY.

AND I WILL ASK OUR JUDICIAL ASSISTANT TO PLEASE SWEAR IN THE PANEL.

THE CLERK: PLEASE STAND AND RAISE YOUR RIGHT HAND.

DO YOU AND EACH OF YOU UNDERSTAND AND AGREE THAT YOU WILL ACCURATELY AND TRUTHFULLY ANSWER UNDER PENALTY OF PERJURY ALL QUESTIONS PROPOUNDED TO YOU CONCERNING YOUR QUALIFICATIONS AND COMPETENCY TO SERVE AS A TRIAL JUROR IN THE MATTER PENDING BEFORE THIS COURT AND THAT FAILURE TO DO SO MAY SUBJECT YOU TO CRIMINAL PROSECUTION? IF YOU UNDERSTAND AND AGREE WITH THIS STATEMENT, PLEASE ANSWER "I DO."

ALL: I DO.